Robert MALABED, Plaintiff,

v.

NORTH SLOPE BOROUGH,
Defendant.

No.. N98–0004 CV (JWS).

United States District Court,
D. Alaska.

April 8, 1999.

Kenneth L. Covell, Fairbanks, AK, for
Malabed, Robert.

David C. Crosby, Wickwire Greene et al,
Juneau, AK, for North Slope Borough
Transit Dept, North Slope Borough.

## ORDER FROM CHAMBERS

SEDWICK, District Judge.

### I. MOTIONS PRESENTED

This case challenges an employment preference adopted by the North Slope Borough ("NSB") to hire Native Americans for all NSB jobs. At docket 7, defendant North Slope Borough Transit Department ("North Slope Transit")[1] moves to

1. Plaintiff's Complaint names North Slope     Transit as defendant, but it is not a legal

dismiss the complaint.[2] Plaintiff Robert Malabed ("Malabed") opposes the motion and cross-moves for partial summary judgment at docket 14. Oral argument was heard in Fairbanks on April 7, 1999.

## II. BACKGROUND

NSB is a political subdivision of the State of Alaska. NSB's population is approximately 74 percent Inupiat Eskimo. NSB is the largest employer in the borough, providing around 63 percent of all jobs. As of 1993, NSB's workforce was approximately 62 percent Inupiat Eskimo, 26 percent Caucasian, and 12 percent Other.

Wishing to increase Native American employment, NSB wrote to the Equal Employment Opportunity Commission ("EEOC") on May 16, 1996, and requested an opinion concerning whether NSB could permissibly adopt an employment preference for Native Americans. EEOC responded by letter dated August 16, 1996. EEOC opined that NSB could adopt an employment preference by relying upon an exemption in Title VII which permits businesses and enterprises located on or near an Indian reservation to grant employment preferences to Indians living on or near a reservation. This opinion, in turn, was based on an earlier 1988 EEOC opinion which concluded that ANCSA land should be considered as a "reservation" for the purposes of Title VII's exemption. EEOC concluded that because there was ANCSA land on the North Slope, NSB was a business or enterprise located on or near an Indian reservation which could avail itself of Title VII's exemption.

Acting on EEOC's opinion, an employment preference ordinance (Ordinance 80–26–12) was introduced in the NSB Assembly on September 3, 1996. The Assembly adopted the employment preference on February 4, 1997. NSB's mayor, Benjamin P. Nageak ("Nageak"), signed the ordinance into law on February 6, 1997. NSB's employment preference provides:

> The granting of employment preference to Native Americans. The preference shall apply to hirings, promotions, transfers, and reinstatements. A Native American applicant who meets the minimum qualifications for a position shall be selected, and where there is more than one Native American applicant who meets the minimum qualifications for a position, the best qualified among these shall be selected. A Native American is a person belonging to an Indian tribe as defined in 25 U.S.C. Section 3703(10).[3]

The resolution introducing the employment preference explains its purpose as follows:

> WHEREAS, the North Slope Borough has recognized that a disproportionately large share of its unemployed resident labor force consists of Inupiat Eskimos; and

> WHEREAS, the majority of Borough residents are Inupiat Eskimos who reside in villages governed under the provisions of the Alaska Native Claims Set-

---

entity separate from the North Slope Borough. Counsel for defendant filed an acknowledgment of service on the North Slope Borough at docket 13. Mr. Crosby also confirmed at oral argument that he was appearing on behalf of the North Slope Borough and said that the court should treat the litigation as if plaintiff had correctly named the defendant as the North Slope Borough. The court will do so. As a consequence, the caption on this order names the North Slope Borough as defendant, although the text of the order sometimes refers to defendant as North Slope Transit, the arm of the North Slope Borough whose actions denied plaintiff employment, and sometimes as NSB. The parties are directed to identify the defendant as the North Slope Borough in the caption of all papers filed hereafter.

2. The motion does not specify on what procedural grounds it is based. The court will treat the motion as a motion for summary judgment under Federal Rule of Civil Procedure 56 because NSB submits materials outside the pleadings with its motion.

3. North Slope Borough Municipal Code § 2.20.150(A)(27).

tlement Act, 43 U.S.C. Section 1601 *et. seq;* and

WHEREAS, to increase the employment of Inupiat Eskimos, the North Slope Borough would like to give an employment preference to Native Americans, as allowed under the terms of section 703(i) of Title VII of the Civil Rights Act of 1964, as amended, for its employment practices in government facilities and activities in areas located on or near regional or village corporation lands; and

WHEREAS, the land held by incorporated Alaska Native groups and regional and village corporations in Alaska under ANCSA is included within the term "reservation" for purposes of section 703(i); and

WHEREAS, the North Slope Borough states that its purpose in establishing an employment preference for Native Americans is to employ and train its Inupiat Eskimo residents in permanent, full-time positions and strengthen the Borough's economy; and

WHEREAS, the preference would extend to all Native Americans regardless of tribal affiliation;

NOW THEREFORE, BE IT ENACTED:

SECTION 1. *Classification.* This ordinance is of a general and permanent nature and shall become part of the Borough Code.

SECTION 2. *Severability.* If any provision of this ordinance or application thereof to any person or circumstance is held invalid, the remainder of this ordinance shall not be affected thereby.

SECTION 3. *Effectiveness.* This ordinance shall become effective upon submission and approval of the implementation plan.

SECTION 4. *Adoption of Section.* Title 2, Chapter 20, section 02.20.150(A)(27) is hereby adopted as annexed hereto as part of Title 2 of the Code of Ordinances of the North Slope Borough.

The employment preference benefits those individuals who are members of a federally recognized Indian Tribe as defined by Congress in 25 U.S.C. § 3703(10). This definition of "Indian tribe" includes corporations organized pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 *et seq.* ("ANCSA").

Malabed is an Asian of Filipino descent; he is not a Native American. Malabed worked for NSB as a temporary security guard from 1994 through 1998. He applied for a permanent security guard position in July 1997. North Slope Transit hired Malabed as a permanent security guard in August 1997, but immediately thereafter canceled the appointment. North Slope Transit re-noticed the position and solicited new job applications. The re-notice announced that NSB's employment preference for Native Americans previously described would apply for the position Malabed sought. Malabed was not hired. North Slope Transit terminated Malabed's temporary employment on January 14, 1998, because NSB law prohibits temporary employees from holding a position longer than 120 days.

Malabed filed suit on June 26, 1998, in state court in Barrow, Alaska. Malabed's complaint alleges that NSB's employment preference contravenes AS 18.80.220, which prohibits employment discrimination, infringes on rights protected by the Alaska Constitution, and violates federal civil rights laws. NSB removed to federal court on August 4, 1998, asserting federal question jurisdiction. No answer has been filed.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[4] The

---

**4.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[5] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[6] All evidence presented by the nonmovant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the nonmovant.[7] However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a factfinder to resolve the parties' differing versions of the truth at trial.[8]

## IV. DISCUSSION

### A. Whether The Employment Preference Violates Borough Law

■ In *Associated General Contractors of California, Inc. v. City and County of San Francisco*,[9] the Ninth Circuit analyzed an employment preference for minority-owned businesses. The court recognized it had a duty to resolve state claims before addressing constitutional issues because "resolution might obviate the need to reach the merits of a difficult federal constitutional question."[10] The court therefore examined the preference in light of San Francisco's charter before addressing any other issues, and held the preference was invalid in part because it violated the charter.[11] In this case, NSB's charter provides:

No person may be discriminated against in any borough employment because of

race, age, color, political or religious affiliation, or natural [sic] origin.[12]

This provision has never been rescinded or amended. An ordinance enacted by a home rule municipality may not violate the municipality's own charter.[13] State law provides:

A home rule municipality is a municipal corporation and political subdivision. It is a city or a borough that has adopted a home rule charter, or it is a unified municipality. A home rule municipality has all legislative powers not prohibited by law or charter.[14]

Here, NSB's own charter prohibits it from enacting an employment preference on the basis of race, political affiliation or national origin. North Slope Transit maintains that tribal membership is not the sort of affiliation mentioned in the charter.

■ In a nutshell, NSB's argument is that the ordinance provides a preference for "Native Americans," a class which takes its definition from federal law and is not a racial or national origin classification. The argument is persuasive as far as it goes, but does not address the fact that the basis upon which federal law recognizes Indians or Native Americans as a distinct class is the fact that Native Americans are members of what were originally independent sovereign nations, later reduced to dependent sovereigns subject to the superior sovereignty of the United States.[15] In other words, the very thing which makes Native Americans a distinct class in federal law is their origin in independent nations. Thus, discrimination in

5. *Id.* at 323–325, 106 S.Ct. 2548.

6. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–9, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

7. *Id.* at 255, 106 S.Ct. 2505.

8. *Id.* at 248–9, 106 S.Ct. 2505.

9. 813 F.2d 922 (9th Cir.1987).

10. *Id.* at 924 n. 4.

11. *Id.* at 924–28.

12. North Slope Borough Charter, Section 16.020(a).

13. *Area Dispatch, Inc. v. Anchorage*, 544 P.2d 1024, 1026 (Alaska 1976); *Lien v. City of Ketchikan*, 383 P.2d 721, 723 (Alaska 1963).

14. AS 29.04.010.

15. *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 154 F.3d 1117, 1119–20 (9th Cir.1998) (citing authority and briefly summarizing relevant principles).

favor of Native Americans is by definition discrimination based upon national origin.

The conclusion that the preference is based upon national origin discrimination is further supported by examining the very federal law whose proffered advantage to .Indians the ordinance seeks to accept. The ordinance seeks to provide a preference consistent with the exemption in Title VII of the Civil Rights Act of 1964 [16] (Title VII) for businesses or enterprises located on or near an Indian reservation,[17] an exemption which renders Title VII's prohibition against discrimination based upon, among other things, national origin,[18] inapplicable. Were discrimination in favor of Indians not discrimination based upon national origin, the exemption would be unnecessary.

At oral argument, NSB's counsel suggested that the exemption is merely prophylaxis against the possibility that Title VII's prohibition against national origin discrimination might be misconstrued to prevent discrimination in favor of Indians. Counsel indicated that the exemption is couched in terms such that nothing in Title VII may be construed to prohibit the discrimination authorized by the exemption. However, the exemption's text clearly indicates that, but for its addition to the statutory scheme, Title VII's prohibition on national origin discrimination would apply to discrimination in favor of Indians. The text of the exemption begins by stating that "Nothing contained in this subchapter shall apply . . . ." Contrary to counsel's suggestion, the text of the exemption does not say that nothing in the subchapter shall be construed to apply to the discrimination authorized by the exemption.

In short, this court is persuaded that the ordinance violates the charter, because it authorizes discrimination based upon national origin. Under Alaska law, a borough ordinance which violates the borough's charter is void. Nevertheless, recognizing the possibility that on appeal an appellate court might fault this court's analysis, it is appropriate to elucidate additional reasons why the ordinance is void.

### B. *Title VII Exemption For Indians Living On Or Near A Reservation*

Title VII generally prohibits employment discrimination based on race, color, religion, sex, or national origin,[19] but contains an exemption which permits businesses or enterprises located on or near an Indian reservation to grant preferential treatment to Indians living on or near a reservation. The exemption provides:

> Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.[20]

Title VII does not define "reservation." North Slope Transit contends that "reservation" must be interpreted to include ANCSA lands. This argument is based on a 1988 EEOC Policy Statement in which EEOC opined that ANCSA land should be considered as a "reservation" for the purposes of Title VII. North Slope Transit does not argue that NSB's employment preference may be justified because of the existence of Native allotments in the Borough or on any other ground.

There are eight villages within NSB. Each of the eight has a federally recognized tribal government [21] and a village corporation organized pursuant to ANCSA.[22] Each of the eight villages is on or surrounded by ANCSA land.[23] Almost all NSB employees live and work in one of the

---

**16.** 42 U.S.C. § 2000e *et seq.*

**17.** 42 U.S.C. § 2000e–2(i).

**18.** 42 U.S.C. § 2000e–2(a).

**19.** 42 U.S.C. § 2000e–2(a).

**20.** 42 U.S.C. § 2000e–2(i).

**21.** *Id.*

**22.** *Id.*

**23.** *Id.*

eight villages. Relying on the 1988 EEOC Policy Statement, North Slope Transit therefore concludes that NSB's employment preference is permissible because businesses or enterprises located on or near ANCSA lands may avail themselves of Title VII's exemption.

In *Alaska v. Native Village of Venetie Tribal Government*,[24] the United States Supreme Court held that land held by Venetie's tribal government pursuant to ANCSA was not "Indian Country." At issue in Venetie was the tribal government's ability to tax a private contractor building a school in the village. Precedent established that the tribal government would enjoy the power to tax nonmembers of the tribe if its land were held to constitute Indian Country. The Court noted that its prior cases recognized three types of Indian Country: (1) Indian reservations; (2) dependent Indian communities; and (3) Indian allotments.[25] The Court observed that ANCSA revoked all reservations in Alaska with one exception. No allotments were at issue. Therefore, the Court determined Venetie could permissibly tax nonmembers of the tribe only if the land it held pursuant to ANCSA constituted a "dependent Indian community." The Court analyzed its precedent and determined that before Indian land could qualify as a dependent Indian community it must be found that the land was set aside for the use of Indians and that the land was subject to federal superintendence.[26] Absent these two findings, the Court said that land would not qualify as a dependent Indian community. The Court concluded ANCSA land was neither set aside for the use of Indians nor subject to federal superintendence. ANCSA land was not set aside for Indians because ANCSA permits Native corporations to transfer property to nonnatives.[27] ANCSA lands were not subject to federal superintendence because ANCSA revoked all but one reservation in Alaska and evinced an intent on the part of the federal government to effect self-determination for Native Americans and end paternalistic federal oversight of Native American affairs.[28] The Court therefore held ANCSA land was not part of a "dependent Indian community." Accordingly, Venetie lacked any authority to tax nonmembers of the tribe.

*Venetie* is fatal to North Slope Transit's position.[29] Venetie instructs that ANCSA land is not part of a dependent Indian community. Indian Country includes reservations, Indian allotments, and dependent Indian communities.[30] ANCSA revoked all reservations except one which is not at issue in this case. Because ANCSA land is not a reservation and it is not part of a dependent Indian community, it necessarily follows that Title VII's exemption is not applicable. The NSB is not "on or near an Indian reservation."

In order to accept North Slope Transit's argument that the term "reservation" as used in the Title VII exemption should include ANCSA land, this court would have to draw the wholly illogical conclusion that ANCSA established that which Congress specifically intended that it not create; viz, a reservation system in Alaska.[31] Moreover, *Venetie* renders such an incongruity untenable as a matter of established

24. 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

25. *Venetie*, 522 U.S. at ——, 118 S.Ct. at 954.

26. *Venetie*, 522 U.S. at ——, 118 S.Ct. at 953–54.

27. *Venetie*, 522 U.S. at ——, 118 S.Ct. at 955.

28. *Venetie*, 522 U.S. at ——, 118 S.Ct. at 955–56.

29. North Slope Transit acknowledges *Venetie* in a cursory footnote, suggesting that it merely applies to jurisdictional issues. North Slope Transit does not explain what "jurisdictional" issues those might be. However, North Slope Transit's effort to sidestep *Venetie* fails, for the decision clearly holds as a matter of substantive law that ANCSA land is not Indian country.

30. 18 U.S.C. § 1151; *Venetie*, 522 U.S. at ——, 118 S.Ct. at 952–53.

31. 43 U.S.C. § 1601(b).

law as well as logic. *Venetie* held ANCSA land did not constitute a "dependent Indian community." As Venetie instructs, a "dependent Indian community" is land set aside for the use of Indians which is subject to federal superintendence. A reservation is created when land is formally set aside for Native Americans under federal superintendence.[32] A reservation is, in effect, simply a more formal or officially recognized variant of a dependent Indian community. Not all dependent Indian communities constitute an Indian reservation. However, all Indian reservations would necessarily be dependent Indian communities as the latter phrase is defined under governing legal principles; that is, all reservations are lands set aside for the use of Indians under federal superintendence. Professor Cohen explains:

It is apparent that Indian reservations and dependent Indian communities are not two distinct definitions of place but rather definitions which largely overlap. All Indian reservations are also dependent Indian communities unless they are uninhabitated.[33]

Because ANCSA land is not set aside for the use of Indians and is not subject to federal superintendence, ANCSA land does not constitute an Indian reservation.

The conclusion that ANCSA lands are not reservations is well supported by various provisions in ANCSA. For example, Section 1620 provides that ANCSA land may be subject to state and local taxation under certain circumstances. Reservations are not subject to similar taxes. Perhaps most significantly, ANCSA declared one of its primary purposes was to convey land:

[W]ithout establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska.[34]

ANCSA's legislative history further supports a conclusion that ANCSA lands are not reservations. The Senate and House Joint Conference Committee reconciling Senate and House versions of ANCSA issued a joint statement. The joint statement unambiguously declares:

[L]ands granted to Natives under this Act [are not to be] considered "Indian reservation" lands for purposes other than those specified in this Act. The lands granted by this Act are not "in trust" and the Native villages are not Indian "reservations." [35]

This clear statement of legislative purpose is not referenced in North Slope Transit's arguments, or in the 1988 EEOC Policy Statement, but evinces a clear intent by Congress to ensure that ANCSA land would not be considered trust lands or reservations.[36] The Alaska State Commission for Human Rights ("ASCHR") noted in one case, "[ANCSA's] legislative history is full of flat statements that ANCSA lands are neither reservations nor trust lands." [37] One leading treatise explains that ANCSA lands were not intended to be reservations because Alaska Natives were disinclined to accept establishment of reservations as a means of settling land claims.[38] The prin-

---

**32.** Reservations may be created by treaty, statute, or executive order. *See* David S. Case, *Alaska Natives and American Laws*, at 83–86 (1984) (for general discussion). However created, reservations exist for the benefit and protection of Native Americans.

**33.** Felix S. Cohen, *Handbook of Federal Indian Law*, at 37 (1982) ("*Cohen*").

**34.** 43 U.S.C. § 1601(b).

**35.** S.Conf.Rep. No. 92–581, at 40 (1971).

**36.** *See, e.g.,* S.Conf.Rep. No. 92–581, at 40 (1971); H.R.Rep. No. 92–523, at 9 (1971); S.Rep. No. 92–405, at 108 (1971); H.R.Rep. No. 92–746, at 40 (1971).

**37.** *Alaska State Comm'n for Human Rights v. Eyak Village Corp.*, C87–105, C88–085, C88–076, January 14, 1993, at 10 (hereafter "ASCHR Order").

**38.** Robert D. Arnold, *Alaska Native Land Claims*, at 106 (2d ed.1978) ("*Arnold*").

cipal objection was that reservations would limit Native ability to "lease, develop, or sell such land without government permission." [39] Moreover, it is hardly surprising that neither Congress nor Alaska Natives would have looked to the reservation system in the Lower 48 as a model worthy of emulation.[40]

North Slope Transit's position that ANCSA lands are reservations for purposes of Title VII's exemption would authorize virtually all private and public employers in Alaska to adopt similar employment preferences which would be exempt from Title VII (and state law under NSB's analysis) because ANCSA land is spread throughout the State.[41] The Ninth Circuit urges caution when such far-reaching implications may arise from the attribution of particular intent to Congressional acts where there is little support for the attribution. As Judge Kozinski noted in *Williams v. Babbitt*,[42] "the total and perpetual exclusion of a majority of the population of Alaska from a particular enterprise is the kind of significant feature we would normally expect Congress to spell out if that were its intent." Similarly, here, if Congress intended ANCSA land to constitute a "reservation" for the purposes of Title VII's exemption, one would expect a more direct expression of this intent.

In what at first blush might be thought a nice counterbalance to the court's concern that treating ANCSA land as a reservation for purposes of the Title VII exemp-

tion would place virtually every community in Alaska on or near a reservation, NSB points out that if ANCSA lands are not reservations, then the Title VII exemption would not apply anywhere in Alaska, except on or near the Metlakatla reservation in southeastern Alaska. However, ANCSA corporations are themselves exempted from Title VII.[43] Thus, each of the hundreds of village corporations and the dozen regional corporations may discriminate in favor of Native Americans without violating Title VII.

North Slope Transit points out that Congress has defined "reservation" as including ANCSA land for the purposes of the Indian Financing Act,[44] and has cross-referenced that definition in other federal provisions affecting tax treatment. From these facts, North Slope Transit contends the Indian Financing Act's definition should apply for all other purposes of federal law. However, this argument is not persuasive. Congress has plenary authority over Indian affairs. Congress could readily amend Title VII to define reservation or could amend Title VII's exemption to clarify that it included ANCSA lands, by cross-reference or otherwise. The fact that Congress has not done so suggests that it did not intend ANCSA land to be considered as a "reservation" for the purposes of Title VII's exemption.

■ North Slope Transit argues that this court must accord substantial, if not Chevron, deference to EEOC's 1988 Policy Statement.[45] Essentially, North Slope Transit contends that appropriate defer-

---

**39.** *Id.*

**40.** The unfortunate failures associated with federal Indian reservation policies have long been noted. One discussion which preceded ANCSA's enactment by only a few years may be found in Note, *The Indian: The Forgotten American*, 81 Harv.L.Rev. 1818, 1838–39 (1968) ("Indian reservations ... are the purest examples of underdeveloped enclaves within American society: infant mortality is seventy percent higher than the national average; almost half the Indian labor force is unemployed; the predominant attitude is one of hopelessness.").

**41.** ANCSA provided for the creation of more than 200 Native village corporations scattered

throughout the State. 43 U.S.C. §§ 1602(c), 1610, and 1615. Depending on the number of residents, each village is entitled to from 69,120 acres to 161,280 acres of land, 16 U.S.C. § 1613(a), except that the nine villages listed in § 1615 are entitled to only 23,040 acres. 43 U.S.C. § 1613(b).

**42.** 115 F.3d at 657, 661 (9th Cir.1997).

**43.** 43 U.S.C. § 1626(g).

**44.** 25 U.S.C. § 1452(d).

**45.** *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Stated somewhat generally, Chevron directs that if a

ence to EEOC's Policy Statement commands this court to adopt EEOC's views and hold that "reservation" for the purposes of Title VII's exemption includes ANCSA land. This argument ignores controlling Ninth Circuit precedent. In *Dawavendewa v. Salt River Project Agriculture Improvement and Power Dist.*,[46] the Ninth Circuit analyzed the same EEOC 1988 Policy Statement that is at issue in this case and advised:

> Generally, EEOC guidelines are entitled to some deference. The level of deference, however, depends on the EEOC's thoroughness of consideration, validity of its reasoning, consistency with earlier and later pronouncements, and power of persuasion. "Ultimately, EEOC statements of policy should always be considered, but they should not be regarded as conclusive unless reason and statutory interpretation support their conclusion."[47]

In *Dawavendewa*, the Ninth Circuit concluded that a portion of the 1988 Policy Statement addressing whether a tribe could permissibly discriminate against an individual belonging to another tribe represented a correct statement of the law. What is significant for present purposes, however, is that *Dawavendewa* instructs that EEOC's 1988 Policy Statement is not entitled to *Chevron* weight.

Further elaboration explains why this court is not inclined to accord EEOC's 1988 Policy Statement much weight. In *Williams*, the Ninth Circuit noted agency interpretations of regulations are not entitled to *Chevron* deference where serious constitutional questions are raised.[48] This case presents serious constitutional questions. North Slope Transit's arguments misapprehend both *Chevron's* import and general principles governing deference which is due agency pronouncements. EEOC's Policy Statement was issued in a factual and legal vacuum. It was not the result of an adversarial process arising in a concrete setting. The Policy Statement therefore lacks the depth and perspective which an actual case or controversy or formal rule making provides. Professor Davis explains that *Chevron* deference does not apply to all agency opinions or policy statements:

> *Chevron* should be held to apply to the meanings agencies give statutes in all legislative rules and in most adjudications. It should not be held to apply to agency pronouncements in less formal formats, e.g., manuals, letters, guidelines, interpretative rules, or litigating positions.[49]

Professor Davis explains further that "Courts should not give binding effect to interpretative rules or statements of policy under *Chevron* [ ]."[50] There are several reasons why courts should assess the purposes and meaning of *Chevron* before applying its principles.[51] Formal rule making or agency adjudication ensures that any resulting decision is tested by the adversarial process or that, at a minimum, there is an opportunity to hear opposing opinions. Policy statements are statements which, however well-researched and persuasively written, do not enjoy the perspective afforded by an adversarial system. In *Dawavendewa*, the Ninth Circuit impliedly approved Professor Davis' views.[52]

Congressional Act is silent or ambiguous regarding an issue of statutory interpretation, courts should determine whether an agency's interpretation is based on a permissible construction of the statute. If the agency's interpretation is within its authority and not otherwise arbitrary or contrary to law, courts should defer to the agency. *See generally*, I Kenneth Culp Davis and Richard J. Pierce, Jr., *Administrative Law*, §§ 3.1–3.6 at 107–31 (3d ed. 1994) ("Davis") (for discussion regarding Chevron principles with citation to authority).

**46.** 154 F.3d 1117 (9th Cir.1998).

**47.** *Id.* at 1121 (citations omitted) (*quoting Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir.1996)).

**48.** *Williams*, 115 F.3d at 662–63.

**49.** *Davis*, § 3.5 at 119.

**50.** *Davis*, § 3.5 at 120.

**51.** *See Davis*, § 3.5 at 120–23 (for discussion).

**52.** *Dawavendewa*, 154 F.3d at 1121.

EEOC's Policy Statement is stale. It was issued over ten years ago, well before *Venetie* and other recent court opinions discussed further below. No court is known to have relied upon the Policy Statement to determine whether ANCSA land should be considered a "reservation" for the purposes of Title VII's exemption. However, EEOC's state counterpart, ASCHR, concluded in *Alaska State Commission for Human Rights v. Eyak Village Corp.*,[53] that special preemption rules governing Indian tribes did not apply to ANCSA corporations because the special rules did not apply to "cases arising outside of Indian country (which generally means outside of reservations, allotments, or similar areas set aside by the federal government for use by dependent Indians)."[54] ASCHR determined ANCSA land could not be considered Indian country. ASCHR noted that "[t]he legislative history is full of flat statements that ANCSA lands are neither reservations nor trust lands."[55] Unlike ASCHR, EEOC did not evaluate ANCSA's legislative history in its 1988 Policy Statement.

Given all the preceding circumstances, this court concludes that EEOC's 1988 Policy Statement is not entitled to any significant deference, much less *Chevron* deference. This court will not adopt EEOC's 1988 Policy Statement as a correct statement of the law.

Assuming that this case is not properly disposed on the grounds that the preference violates the NSB charter, this court would hold that ANCSA land is not "Indian Country" and specifically not a "reservation" for the purposes of Title VII's exemption. Such a holding would render it unnecessary to address North Slope Transit's argument that Title VII preempts state law, or Malabed's argument that North Slope Transit should not be considered a "business" or "enterprise" for the purposes of Title VII's exemption.

## C. *Whether the Employment Preference Violates Federal Law*

Malabed alleges a claim based on a violation of the United States constitution pursuant to 42 U.S.C. § 1983. To establish a claim under 42 U.S.C. § 1983, Malabed must demonstrate that (1) the defendants acted under color of law, and (2) deprived him of a constitutional right.[56] Although Malabed raises several different arguments, the constitutional right most clearly implicated is his right to equal protection under the Fourteenth Amendment.

### 1. *Equal Protection Analysis*

■ The Fourteenth Amendment prohibits any state or subdivision of a state from denying "to any person within its jurisdiction the equal protection of the laws."[57] Equal protection analysis under the federal constitution involves a tiered approach depending upon the nature of the individual right. Legislation affecting a fundamental right or suspect classification is subject to strict judicial scrutiny.[58] Examples of laws subject to strict scrutiny include classifications based on race, ancestry, and alienage, or laws affecting fundamental rights such as privacy, marriage, and freedom of association.[59] Where such fundamental rights or suspect classifications are implicated, the state's act must be precisely or narrowly tailored to serve a compelling state interest.[60] Legislation not affecting a fundamental right or a suspect classification is examined using the rational basis test.[61] Such legislation will be upheld so long as it is rationally related

---

53. ASCHR No. C–87–105, C–88–085, C–88–076 (unpublished decision dated January 14, 1993).

54. ASCHR Order, at 8–9.

55. ASCHR Order, at 10.

56. *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir.1987).

57. U.S. Const. amend. XIV.

58. *Hoffman v. United States*, 767 F.2d 1431, 1434 (9th Cir.1985).

59. *Id.* at 1434–35.

60. *Id.* at 1435.

61. *Id.* at 1435.

to a legitimate state interest.[62] An intermediate level of scrutiny requires some state action to be substantially related to an important state interest.[63] This intermediate level of scrutiny is most commonly used to assess classifications based on gender or legitimacy.[64]

### 2. *Determining The Level of Scrutiny*

North Slope Transit contends NSB's employment preference is merely a preference favoring a political classification (tribal membership) and thus subject to a low level of scrutiny.[65] The distinction related to a tribe's political nature finds its source in the sovereign nature of Native American tribes. *Morton v. Mancari*,[66] is based on the relationship between sovereign governments; that is, Indian tribes and the federal government.[67] *Mancari* upheld an employment preference used by the Bureau of Indian Affairs because the court concluded the preference served the federal government's goal of promoting Indian self-government. The Ninth Circuit interprets *Mancari* "as shielding only those statutes that affect uniquely Indian interests." [68] This interpretation is consistent with long-recognized principles.[69] NSB's employment preference is in no way related to Native land or tribal or cultural affairs. Public employment with NSB is not part of some uniquely Indian interest, or time-honored, tribal tradition. *Mancari's* rationale would seem inapplicable here. However, this court need not decide whether NSB's preference is based on a political or racial classification.[70] Charac-

62. *Id.*

63. *Navarro v. Block,* 72 F.3d 712, 716 (9th Cir.1995).

64. *Hoffman,* 767 F.2d at 1435.

65. This argument is somewhat undermined by North Slope Transit's reliance on Title VII's exemption. If NSB's preference was merely a preference favoring a political classification, North Slope Transit would not need to rely on Title VII's exemption because political status, affiliation, or membership are not protected classifications under Title VII. However, for reasons discussed in the text of this order, this court need not decide whether the preference favors a protected or unprotected classification.

66. 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

67. *Mancari,* 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24.

68. *Williams v. Babbitt,* 115 F.3d 657, 665 (9th Cir.1997).

69. Ralph W. Johnson and E. Susan Crystal, *Indians and Equal Protection,* 54 Wash.L.Rev. 587, 599, 627 n. 216 (1979) (*"Johnson "*). Professor Johnson notes that the *Mancari* Court's test is "limited to those [acts] which fulfill Congress' unique obligation toward the Indians." *Id.* at 599. "[I]f a law does not further [the federal trust relationship toward Indians], the rationale for the *Mancari* rule is absent." *Id.* at 627 n. 216.

70. The continuing validity of *Mancari's* analysis is subject to some question. In *Adarand*

*Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the United States Supreme Court held a preference favoring "Native Americans" among others was subject to strict scrutiny. In *Williams, supra,* Judge Kozinski observed that *"Mancari's* days are numbered" if one assumes that Justice Stevens' dissent in *Adarand* is right. *Williams,* 115 F.3d at 665. *Mancari* has not been overruled. *Rice v. Cayetano,* 146 F.3d 1075, 1081 n. 17 (9th Cir.1998). However, application of its principles in each case must be made with reference to its purpose. *Williams,* 115 F.3d at 665. Scholars have long-criticized *Mancari's* characterization of preferences based on tribal membership as being "political" rather than "racial" or "ethnic" classifications. *See Johnson, supra,* 54 Wash.L.Rev. at 598 n. 78 ("The Court's characterizing the classification as political, however, is not useful in determining what level of scrutiny to apply to federal Indian legislation in equal protection cases."); David C. Williams, *The Borders of The Equal Protection Clause: Indians as Peoples,* 38 U.C.L.A.L.Rev. 759 (1991); Wayne R. Farnsworth, *Bureau of Indian Affairs Hiring Preferences After Adarand Constructors, Inc. v. Pena,* 1996 B.Y.U.L.Rev. 503, 509–510 (1996) ("To say, as the Mancari Court did, that the criteria was 'not even a racial preference' stretches the imagination, and is comparable to suggesting that discriminating on the basis of pregnancy is not the same as discrimination on the basis of gender."); Patricia A. Kaplan, *When States' American Indian Teacher Preferences in Public Schools Violate the Fourteenth Amendment,* 17 Hamline L.Rev. 477, 494 (1994) ("[T]he Supreme Court's justification of a lower level of

terization of the preference as a political rather than a racial classification does not automatically result in a lower level of scrutiny being employed.

In *Williams v. Babbitt*,[71] the Ninth Circuit held unconstitutional on equal protection grounds an agency's interpretation of federal law which prohibited non-Natives from herding reindeer in Alaska. The court applied a strict scrutiny analysis and rejected arguments that *Mancari* authorized blanket preferences. The court stated:

> While *Mancari* did not have to confront the question of a naked preference for Indians unrelated to unique Indian concerns, [the agency's] interpretation of the Reindeer Act would force us to confront that very issue. According to [the agency], the Reindeer Act provides a preference in an industry that is not uniquely native, whether the beneficiaries live in a remote native village on the Seward Peninsula or in downtown Anchorage. The Act in no way relates to native land, tribal or communal status, or culture.[72]

The court observed that no law giving "natives so broad a preference" in any particular industry was known to exist.[73] The court explained that *Mancari's* rationale embraced legislation that affected "Indian land, tribal status, self-government or cultur[al]" issues.[74] The court clarified that "[w]hile *Mancari* is not necessarily limited to statutes that give special treatment to Indians on Indian land, we do read it as shielding only those statutes that affect uniquely Indian interests."[75] The court emphasized it was "seriously doubt[ful]" whether Congress could grant Native Americans an absolute monopoly in any one particular industry, such as the casino industry.[76] Applying a strict scrutiny standard, the court held the agency's interpretation of federal law could not withstand analysis.[77] *Williams* illustrates that characterizing Native American interests as political rather than racial or ethnic does not automatically result in a lower level of scrutiny being used.

In *Tafoya v. City of Albuquerque*,[78] the court analyzed an ordinance which restricted licenses to sell goods to "New Mexico residents who are members of the Navajo Nation or of a federally recognized Indian tribe or pueblo."[79] Albuquerque raised the same argument that is raised in this case; specifically, that the ordinance merely targeted a political classification based on tribal membership as opposed to a racial or ethnic classification, and thus should be upheld. The court accepted without question Albuquerque's characterization of the ordinance as a political classification. However, the court nevertheless rejected Albuquerque's arguments. The court held Albuquerque's ordinance was subject to strict scrutiny because the city had "made no particularized showing of past discrimination against members of federally recognized Indian tribes or pueblos or against members of the Navajo Nation [with respect to the licenses in question]."[80] This result followed from two related points. First, unlike Congress, Albuquerque had no constitutional mandate to advance the interests of Native Americans as opposed to the interests of all other citizens. Second, unlike Congress, Albuquerque had no constitutional authority to enact remedial ordinances purported-

review of federal action affecting Indians based on a distinction between Indians as a political group versus a race ... has been heavily criticized.").

71. 115 F.3d 657 (9th Cir.1997).

72. *Id.* at 664.

73. *Id.*

74. *Id.*

75. *Id.* at 665.

76. *Id.*

77. *Id.* at 665–66.

78. 751 F.Supp. 1527 (D.N.M.1990).

79. *Id.* at 1528.

80. *Id.* at 1531.

ly designed to cure the perceived effects of past societal discrimination.

This case is conceptually similar to *Tafoya*. Here, NSB enacted an ordinance affecting the right to work. The ordinance creates an employment preference for Native Americans. The ordinance is based on general statistical studies and assumptions inferred from those studies. However, there is no evidence that Native Americans have been subjected to discrimination by the NSB in public employment. To the contrary, the undisputed record establishes that Native Americans constitute the overwhelming majority of NSB's workforce. NSB has no constitutional mandate to promote Indians' interest. NSB has no constitutional authority to enact remedial ordinances designed to cure general societal discrimination. As Justice O'Connor noted in *City of Richmond v. J.A. Croson Co.*,[81] states do not possess the remedial powers Congress enjoys under the Fourteenth Amendment.[82] The constitutional constraints are not removed because one invokes an "Indian" or "Native American" classification. Professor Johnson explains:

> States do not have the same trust relationship toward Indians as the federal government, and thus the equal protection analysis applied to state action would ordinarily differ from that applied to federal legislation. One court has held, however, that under the right circumstances the special federal relationship toward Indians also enables a state to single out tribal Indians for preferential treatment. This presents some analytical problems. While it is not invalid for the state to adopt a protective attitude toward the tribes, a trust relationship between states and Indians has never been recognized by Congress or the Supreme Court. It is not clear,

therefore, that because Indian preferential treatment is constitutional for the federal government, it is valid for a state.[83]

Under these circumstances, the ordinance is subject to strict scrutiny.

In *Adarand Constructors, Inc. v. Pena*,[84] the United States Supreme Court held that a preference granted to Native Americans, among others, must be analyzed under strict scrutiny. The Court held all racial classifications imposed by any government (federal, state, or local) must be analyzed under strict scrutiny. The particular preference in issue awarded prime contractors on United States Department of Transportation projects additional compensation if they subcontracted with certain minority-owned businesses.[85] These included businesses owned by "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities [ ]."[86] The Court held the same standard must apply to all and would not be dependent upon a particular individual's race regardless of whether the classification in issue presented a burden or a benefit.[87] In dissent, Justice Stevens stated his view that the constitution should treat benign efforts to remedy past discrimination differently than efforts by a political majority to impose its will on others. Justice Stevens noted:

> As a matter of constitutional and democratic principle, a decision by representatives of the majority to discriminate against the members of a minority race is fundamentally different from those same representatives' decision to impose incidental costs on the majority of their constituents in order to provide a benefit to a disadvantaged minority. Indeed, as I have previously argued, the former is

---

**81.** 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

**82.** 488 U.S. at 490, 109 S.Ct. at 720.

**83.** *Johnson, supra,* 54 Wash.L.Rev. at 609.

**84.** 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

**85.** 515 U.S. at 205, 115 S.Ct. at 2102.

**86.** *Id.*

**87.** 515 U.S. at 224, 115 S.Ct. at 2111.

virtually always repugnant to the principles of a free and democratic society, whereas the latter is, in some circumstances, entirely consistent with the ideal of equality.[88]

Here, of course, the circumstances present a scenario which is "virtually always repugnant to the principles of a free and democratic society." NSB is overwhelmingly composed of Inupiat Eskimos. Six of the seven members of the NSB Assembly are Inupiat Eskimos, as is the mayor. NSB's political base is dominated by Inupiat Eskimos. As Justice Stevens' comments recognized, the very nature of strict scrutiny finds its source in judicial recognition that the political process may be subverted by a majority.[89] Professor Tribe instructs:

> The core idea of equal protection strict scrutiny, as we have seen above in the context of fundamental rights analysis, is to subject governmental choices to close inspection in order to preserve substantial values of equality and autonomy. We have observed that strict scrutiny as a judicial device may lead to restructuring the political decision-making process itself, as through facial invalidation of voting schemes weighted against certain groups in society; or it may lead to striking down specific outcomes of the established political process as insufficiently justified, especially given the character of the groups burdened. The central concern has been to root out any action by government which, in Justice Stone's phrase, is tainted by "prejudice against discrete and insular minorities," the sort of prejudice "which tends . . . to curtail the operation

of those political processes ordinarily to be relied upon to protect minorities" in our society.[90]

These precise circumstances exist here for the reasons already stated. Inupiat Eskimos are the constituent majority that dominates political life in the North Slope Borough. Courts should be particularly alert when a majority arrogates to itself special privileges and rights otherwise denied to similarly-situated members of the minority.

NSB's employment preference is therefore subject to strict scrutiny for all of the reasons previously discussed.

### 3. Analysis of NSB's Employment Preference

In *City of Richmond v. J.A. Croson Co.*,[91] the United States Supreme Court held employment preferences affecting fundamental rights or suspect classifications could not withstand constitutional scrutiny in the absence of particularized findings logically related to the perceived evil sought to be remedied.[92] The Court held that generalized statistical studies were not sufficient to support such preferences.[93]

*J.A. Croson* presented an employment preference adopted by the City of Richmond. The ordinance required general contractors on Richmond's public construction projects to set aside at least 30 percent of the dollar value of their contract for minority-owned businesses.[94] Richmond's population was at least 50 percent minority.[95] No direct evidence of discrimination was presented to Richmond's City Council before the ordinance was passed.[96]

---

88. 515 U.S. at 245–47, 115 S.Ct. at 2122–23 (J. Stevens, dissenting).

89. *United States v. Carolene Prod.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938).

90. *Laurence H. Tribe, Constitutional Law*, § 16–13 at 1465 (2d ed.1988).

91. 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

92. *J.A. Croson*, 488 U.S. at 493, 499–502, 510–11, 109 S.Ct. at 721–22, 724–26, 730–31.

93. *Id.*

94. 488 U.S. at 477–78, 109 S.Ct. at 713.

95. 488 U.S. at 479, 109 S.Ct at 714.

96. 488 U.S. at 480–81, 109 S.Ct. at 714–15.

Instead, Richmond relied upon assumptions inferred from general statistical studies. After lengthy litigation, which included one prior trip to the United States Supreme Court, the Fourth Circuit held Richmond's set aside violated the Fourteenth Amendment. The Court affirmed in a plurality opinion authored by Justice O'Connor. The Court noted:

> In this case, blacks constitute approximately 50% of the population of the city of Richmond. Five of the nine seats on the city council are held by blacks. The concern that a political majority will more easily act to the disadvantage of a minority based on unwarranted assumptions or incomplete facts would seem to militate for, not against, the application of a heightened judicial scrutiny in this case.[97]

Justice O'Connor condemned the practice of relying upon "a generalized assertion [of] past discrimination" to correct perceived instances of societal discrimination.[98] Such generalized assertions could not support sweeping efforts to rectify past societal discrimination where no actual discrimination was identified.[99] The Court emphasized that states and subdivisions of states did not enjoy Congressional powers and could not appropriate such powers to enact far-reaching remedial legislation without adequate support:

> That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions.[100]

North Slope Transit argues that NSB's employment preference merely favors a political classification based on tribal affiliation. As previously discussed, this classification does not insulate NSB's employment preference from scrutiny. Indeed, the *J.A. Croson* Court observed:

> There is, of course, another possibility that should not be overlooked. The ordinance might be nothing more than a form of patronage. But racial patronage, like a racial gerrymander, is no more defensible than political patronage or a political gerrymander. A southern State with a long history of discrimination against Republicans in the awarding of public contracts could not rely on such past discrimination as a basis for granting a legislative preference to Republican contractors in the future.[101]

NSB's employment preference is based on nothing more than a generalized statistical study accompanied by equally generalized assumptions. There is no evidence of actual discrimination against Inupiat Eskimos. There is no evidence that NSB, as an employer, has discriminated against Inupiat Eskimos. Indeed, the exact opposite is true.

The undisputed facts establish that the overwhelming majority of workers in the Borough are Inupiat Eskimos. There are no particularized findings which would support a conclusion that the employment preference is logically related to the perceived evil it seeks to remedy. There is no indication that other, less-intrusive means were considered before adopting a flat 100 percent employment preference. When the resolution was introduced and enacted, there was no evidence that perceived unemployment problems existed because of an individual's status as an Inupiat Eskimo. Unemployment among Inupiat Eski-

---

97. 488 U.S. at 495–96, 109 S.Ct. at 723.

98. 488 U.S. at 498, 109 S.Ct. at 724.

99. 488 U.S. at 498–501, 109 S.Ct. at 724–25.

100. 488 U.S. at 490, 109 S.Ct. at 720 (emphasis in original).

101. 488 U.S. at 516 n. 9, 109 S.Ct. at 734 n. 9 (citations omitted).

mos could be attributed to a host of other factors, such as lack of training, education or experience.

Given that there is no evidence that Inupiat Eskimos suffer unemployment in the North Slope Borough because of their status as Inupiat Eskimos, it seems far more likely that their unemployment is a consequence of the limited employment opportunities available in the borough. Such limited opportunities affect all persons living in rural Alaska regardless of their race, political affiliation, national origin, or any other classification.

The Ninth Circuit's opinion in *Williams* also compels the conclusion that NSB's employment preference fails equal protection scrutiny. The employment preference does not relate to a uniquely Indian interest. Public employment with NSB cannot promote tribal self-government because two completely different entities are involved. There is no time-honored, tribal tradition involved. NSB's employment preference is a blanket 100 percent preference for all jobs for all purposes. Inupiat Eskimos can claim no cultural birthright to a job with a state subdivision. Public employment with NSB is no more a uniquely Indian interest than it is a uniquely Filipino interest. Judge Kozinski questioned whether a preference could be granted to

favor Native Americans or to exclude all non-Native Americans from any one industry.[102] NSB's employment preference effectively does just that by setting aside all public employment jobs for all purposes for Native Americans. NSB is by far the largest employer in the borough. NSB's employment preference grants Native Americans a 100 percent blanket preference for all NSB jobs, a preference which covers a geographical area larger than many states.

NSB's employment preference cannot withstand even cursory analysis under the principles set forth in *J.A. Croson and Adarand Constructors*.[103] NSB's employment preference is not precisely or narrowly tailored to meet a compelling state interest. It therefore violates the Fourteenth Amendment's equal protection clause, and North Slope Transit may not use it to discriminate against Malabed.[104]

## V. CONCLUSION

For the foregoing reasons, North Slope Transit's motion to dismiss at docket 7 is **DENIED**. Malabed's cross motion for summary judgment at docket 14 is **GRANTED** as follows: NSB may not rely upon NSB Municipal Code § 2.20.150(A)(27) to deny Malabed an equal employment opportunity. NSB Mu-

---

102. *Williams, supra,* 115 F.3d at 665.

103. *J.A. Croson* was decided during a term when the Court issued several significant Title VII decisions. These included, *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In response, Congress ultimately enacted the Civil Rights Act of 1991 which amended Title VII for the purpose of "overruling" various aspects of these decisions. However, nothing in the Civil Rights Act of 1991 affected *J.A. Croson's* Fourteenth Amendment analysis, a conclusion apparent from the Court's 1995 opinion in *Adarand Constructors* or the Court's insistence on meaningful statistical proof.

For a discussion of the Civil Rights Act of 1991, *see* Richard L. Neumeier, *Civil Rights Act of 1991: What Does it Do? Is it Retroactive?,* 59 Def.Couns.J. 500, 500–10 (1992).

104. The result would not differ even if the court analyzed NSB's employment preference under a rational basis standard. To satisfy scrutiny under a rational basis test, the preference would have to be rationally related to a legitimate state interest. Although the rational basis standard of review contemplates an extremely high level of judicial deference to state legislation, which will almost invariably result in such legislation being upheld, the circumstances presented by this case are unique. The employment preference is contrary to NSB's own charter, so it cannot be said that the preference is rationally related to a legitimate state interest.

nicipal Code § 2.20.150(A)(27) is hereby declared invalid and unenforceable.