Paul LIVINGSTON et al., Plaintiffs,

v.

George EWING et al., Defendants,

and

Dennis Anderson et al., Intervenors.

No. 77–192–M Civil.

United States District Court,
D. New Mexico.

July 17, 1978.

Paul Livingston and Sara Livingston, pro se.

Toney Anaya, Atty. Gen., Jill Z. Cooper, Asst. Atty. Gen., Santa Fe, N. M., for defendants Ewing and Regents of the Museum.

Bob Barberousse, Santa Fe, N. M., for Pick, Miller and the City Council of Santa Fe.

Michael P. Gross, Solomon, Roth, & Van Amberg, Santa Fe, N. M., for third-party defendants.

L. Lamar Parrish, Ussery, Burciaga & Parrish, Albuquerque, N. M., for All Indian Pueblo Council, Inc., amicus curiae.

## MEMORANDUM OPINION AND ORDER

MECHEM, District Judge.

This action is before the Court on cross motions for summary judgment by plaintiffs Livingston and defendants Ewing and the Museum of New Mexico. These parties are in agreement and I find that there is no genuine issue of material fact; intervenors oppose the motions for summary judgment, but I find that, on the basis of the law, affidavits, exhibits, and testimony submitted with these motions, it is proper to grant summary judgment in favor of the defendants.

This case involves the question of whether the Museum of New Mexico's policy permitting only Indians to sell their hand-made goods under the portal of the Palace of the Governors violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs argue that the policy violates the Fourteenth Amendment because it is an unjustified classification based upon race. Defendants claim that there is a rational basis for the policy, and that they may constitutionally give a preference to Indians. Intervenors are Indian craftspeople who sell their wares under the portal; they argue that the Museum may undertake programs which enhance the ability of distinct cultural communities to maintain their self-determination and lifestyle.

## FACTS

In 1909, the New Mexico Legislature established the Museum of New Mexico, giving its Board of Regents the responsibility for management and control of the property and policy of the Museum. The historic Palace of the Governors in Santa Fe, the oldest public building in the United States, was placed under the control of the Regents for the use of the Museum. The portal is the patio portion of the Palace of the Governors and is thus under the control of the Regents. When the Museum was created, it was dedicated to the presentation and preservation of New Mexico's multicultural traditions.

The Palace of the Governors has historically been visited and used for various purposes by several cultural groups. The Pueblo Indians occupied the Palace after the Pueblo Revolt of 1680–1693, and subsequent to the Reconquest by the Spaniards, the Indians sought justice from the governors in disputes over land, water, and personal rights. In addition, the Indians travelled to the Palace to sell food and miscellaneous wares. The plaza area was used as a market place by both Hispanos and Pueblo Indians after the Spanish conquest; later, Anglo traders and businessmen established shops in the plaza. Sometime prior to 1853, several ethnic groups began to use the portal as a public market place. By 1909, the non-Indian groups had largely abandoned

the portal and only the Indian market remained.

The Museum's first director adopted a policy of incorporating the Pueblo Indians into the program of the Museum; they were encouraged to utilize its facilities to revitalize their native arts and crafts, for their own economic benefit, and for the benefit of the Pueblo communities as a whole. In addition, it was felt that by stimulating the native crafts, New Mexico's rich and diverse ethnic traditions would be highlighted and preserved. Finally, the presence on the Palace grounds of the Indians as they made and sold their crafts provided living educational exhibits, from which the public has benefited.

In 1935, the Museum began to permit only Indians to use the space in the portal for the sale of their arts and crafts. At that time, by agreement with the Museum, the New Mexico Association of Indian Affairs sponsored an Indian Market under the portal. It was discontinued during World War II but immediately thereafter the Museum permitted exclusive year-round use of the portal by the Indians. This practice has been in effect since that time, but was formalized as Museum policy by the Regents in 1972. In February, 1976, a written policy statement was issued to insure that no vendors would be allowed to sell on Museum property, except the Indians.[1] There is no dispute that the Museum policy grants a preference to Indians not afforded to non-Indians.

The Indians under the portal are charged with the responsibility of allocating the space, maintaining a fair and orderly market, and guaranteeing that the articles offered for sale are genuine Indian handmade goods. It is not the policy of the Regents to operate an open market: the portal is to be used for the Indian program or not at all.

The program is not limited to New Mexico Indians, although few Indians from other areas of the country use the portal to sell their crafts. If there is a dispute, the director of the Museum or a member of his staff checks with the BIA office or the area office at the Reservation to determine whether persons claiming to be Indians are members of Federally recognized Indian tribes or pueblos. Most of the Indians who sell their arts and crafts under the portal live within the Pueblos of New Mexico, maintain their own native culture and remain unassimilated into the predominant American culture. They primarily speak their native languages and maintain strong ties with the traditional religious and social customs of their people.

It is undisputed that the viability and economic well-being of the Pueblos depends significantly upon the income which is produced by the sale of hand-made goods under the portal. Thus, there is a direct link between the portal program and the self-determination of these Indians. If the market were to be opened to all vendors, the Indians would gradually retreat from or evacuate the Portal, fearing conflicts with the non-Indian vendors. Conflicts between the plaintiff, Paul Livingston, and one or two of the Indians selling under the Portal have already occurred. The eventual outcome would probably be that the Pueblo Indians would be largely dependent upon welfare instead of their own work, and the quality and production of traditional arts and crafts might suffer.

---

1. The policy statement reads in part as follows:
  WHEREAS, the presence of Indian artists and craftsmen at the Palace of the Governors has been an integral part of history, tradition, and function of the Museum of New Mexico for many years;
  . . . NOW, THEREFORE, BE IT RESOLVED BY THE REGENTS OF THE MUSEUM OF NEW MEXICO that policy of the Museum with respect to the display and sale of merchandise on the grounds and areas of the Museum shall be as follows:

1. Other than during annually scheduled markets, no person nor group of persons will be permitted to display or sell merchandise on the grounds belonging to the Museum of New Mexico with the sole exception that the area directly under the portal in front of the Palace of the Governors may be used by Indians to display and sell arts and crafts produced by hand by Indian artists and craftsmen.

The plaintiffs have not established that their means of earning a livelihood is severely curtailed by the portal policy. They produce jewelry, some of which is fashioned after Indian designs. The Museum of New Mexico Foundation operates the Museum Shop in the Palace which accepts all kinds of art subject only to criteria for quality, authenticity, and the relationship of the art to the programs of the Museum. The plaintiffs can sell their handicrafts through various outlets, and have done so in the past, although the Museum Shop has rejected it as being of inferior quality and lacking in authenticity. There have been complaints from tourists that they had purchased from non-Indians under the portal, what they believed to be Indian-made jewelry, which actually proved to be something other than authentic.

The exhibits in the Museum are selected on a cultural basis, with the emphasis placed upon authenticity and the special historical relationship, if any, that such exhibits might have with the Palace itself. Each exhibit displays a discrete New Mexican cultural or ethnic heritage; it is felt that co-mingling the cultures is less instructive because this fails to clarify the lines of historical development within each culture. The portal program is authentic in that it presents what remains of a traditional market: there is no dispute that the Indians are the only remaining, relatively unchanged craftsmen of the original group who sold their wares under the portal. The portal exhibit presents one aspect of the Indian culture and allows the public to interact with it, which the Museum views as a substantial benefit to the public.

The Museum of New Mexico must, by its very nature, be culturally selective. The inclusion or exclusion of various exhibits is based upon the director's and Regents' view of the best way to present and preserve the historical cultures of New Mexico. The policy of the Museum to allow only Indians to sell their hand-made crafts under the portal is the expression of a choice made by the Museum based upon cultural considerations. The Museum, through this policy, seeks to foster native Indian arts, give impetus to

the communities from which these arts arise, educate the public, and protect a unique tradition from assimilation so as to maintain, as best they can, its purity. The Museum's choice, therefore, is for the type of cultural style known as "traditional Indian arts and crafts"; items falling within this group must, by definition, be made by Indians. This was emphasized in one of the Intervenor's affidavits, and uncontroverted by the plaintiff:

> When we refer to ethnic arts we are not referring to a racial designation, but to a system of expressions shared by members of a self-identified cultural group that perceives itself and is perceived by others as having a unique esthetic tradition. While individual members of such groups usually have much latitude for creativity, the tradition itself defines the style and sets forth certain rules or approaches that distinguish it from other cultural groups. Indian and especially Southwestern Indian arts constitute a recognized ethnic artistic style . . . Affidavit of Barry Toelken.

Thus, the policy of permitting only Indians to sell their hand-made goods under the portal is the means by which the Museum's decision to present and preserve the Indian culture has been effectuated. The prohibition of sales on Museum property operates against everyone except Indians because only Indians can produce hand-made Indian goods, and the Museum has determined that the most benefit would be derived by the public if only Indians were permitted to sell the goods that they or other Indians make.

## LAW

██ The fact that the Museum is culturally selective does not in itself violate the Fourteenth Amendment, *McGowen v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 293 (1961) and Justice Douglas' dissent in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). In *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the City Council's ordinance barring certain vendors

from the historic French Quarter, was aimed at "enhancing the vital role of the French Quarter's tourist-oriented charm in the economy of New Orleans." P. 303, 96 S.Ct. p. 2516. The Court stressed that it would defer to the judgment of the City Council on questions of the economy of the city and the preservation of the charm and beauty of an historic area, unless the classification "trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion or alienage." P. 303, 96 S.Ct. p. 2516. In *Avins v. Rutgers*, 385 F.2d 151 (1967), cert. denied, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968), the Third Circuit upheld the right of a law review editor to exercise judgment as to inclusion of articles in the publication, noting that there was no constitutional right to publish one's opinions wherever and whenever one pleased.

The inquiry therefore, must be into whether the Museum's cultural selectivity has been exercised in such a way as to infringe upon the plaintiffs' fundamental rights or to operate against the plaintiff or for the Indians on the basis of race. If so, then a strict standard of scrutiny must be applied to the policy's reasonableness; if not, the policy need only bear a rational relationship to a legitimate state interest. *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

## A. IS THE MUSEUM POLICY BASED ON RACIAL PREFERENCE?

■ The factual background of this case compels the conclusion that the Museum's policy excludes certain vendors on a cultural, not a racial, basis. Several U. S. Supreme Court cases and a substantial body of federal law would also permit no other conclusion.

Because of their unique cultural, legal, and political status, Indians have consistently received special or preferential treatment, from the federal and state governments. This treatment has been challenged as being violative of equal protection; how-

ever, the U. S. Supreme Court has found that, because these distinctions are not made on the basis of race, they need only be rationally related to a legitimate state interest, and the constitutional challenges have ultimately failed.

The Amicus brief details the historical and legal background that justifies the preferential treatment of Indians. Article I, Section 8 of the United States Constitution grants special status to Indians by giving Congress the exclusive power to regulate commerce with the Indian Tribes. Title 25, United States Code, is entirely concerned with Indians; the *New Mexico Constitution*, Article XXI, Section 2, protects Indian lands, and Sections 73–31–1 *et seq.* establish a state agency to encourage the preservation and development of Indian arts and crafts. Title VII, 42 U.S.C. § 2000e–2(i) exempts Indians on or near reservations from the equal employment provisions of that Title. The list of special laws, and cases giving preferential treatment to Indians is considerable, and the justification for all of this lies in the appreciation of the uniqueness of Indian communities, their wish to maintain a separate way of life, and the benefit that the preservation of such will confer upon society.

In the landmark case of *Morton v. Mancari, supra,* the Court denied a constitutional attack upon the preference for hiring Indians within the Bureau of Indian Affairs. In finding that this preference was not an invidious classification based upon race, but was rather a political preference, the Court relied upon the historical relationship between the federal government and the Indian people, and upon their definition of the alleged "racial group":

> The preference is not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as "Indians'. In this sense, the preference is political rather than racial in nature. Note 24, p. 553, 94 S.Ct. p. 2484.

■ The holding in this case makes clear that in any equal protection analysis dealing with Indians, the historical, legal and cultural context must be considered in determining whether an Indian preference constitutes invidious racial discrimination.

■ The reasons for this approach are fairly obvious. Because the federal government and the State of New Mexico are committed to insure the political separateness and cultural survival of Indian tribes, and because Indians who live on or near a reservation are members of distinctive cultural communities which would be gradually destroyed if some protection were not given against forced assimilation, Indians have gained a unique status in the law which no other group, racial or otherwise, can claim. As a result, traditional equal protection analysis falls grossly short of dealing in a fair manner with the question of Indian preference, unless it takes these factors into account.

In the present case there simply are no material uncontroverted facts which would give rise to a conclusion that this is a racial classification. On the contrary, the facts indicate a cultural basis for the Museum's policy: the basic nature and purpose of the Museum to present and preserve historical cultures, not races; the Museum's desire to provide an opportunity which will foster Indian arts and crafts; the fact that only members of federally-recognized Indian tribes may sell under the portal; the fact that at any one time the Museum displays, inside the Palace, not just Indian culture, but other historical New Mexico cultures as well; and the special recognition given to the Indian cultures by the State of New Mexico in legislation designed to encourage traditional arts and crafts.

■ The requirement that the sellers of Indian hand-made goods be Indian does not make the Museum's preference one based upon race. It is the only logical way the Museum could carry out its cultural selectivity and still serve the Museum's educational purposes. The Museum is not in the business of sponsoring an open market, and to maintain its own standards of authenticity and historical relevancy, the Museum could not allow for the sale of imitation crafts by non-indigenous craftsmen.

■ The Museum has argued that the plaintiffs are not members of a suspect class, or a discrete and insular minority, so that the standard of strict scrutiny should not be applied. This type of equal protection analysis in cases involving Indian preference is singularly inapplicable. It is obvious that the plaintiffs are not members of a suspect class: the policy operates to exclude everyone in the world except Indians. This type of analysis overlooks the complexities which *Mancari, supra,* deems essential to a fair analysis of this type of case. Thus, having determined that the preference here is not based upon race, it is not helpful to determine whether it operates against a suspect class. It does operate for the benefit of many people, Indian and non-Indian, without regard to race.

### B. DOES THE MUSEUM POLICY INFRINGE UPON PLAINTIFFS' FUNDAMENTAL RIGHTS?

■ Even though the Museum's policy is not based on a racial classification, if it infringes upon one of the plaintiffs' fundamental rights, then the standard of strict scrutiny must be applied in the determination of the policy's reasonableness. It is clear that these must be rights which are guaranteed, implicitly or explicitly, by the U. S. Constitution, and plaintiffs have presented no evidence establishing such right. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The plaintiffs' exclusion from the portal does not deprive them of their First Amendment rights to freedom of expression since these rights are not absolute and do not guarantee every individual the exact forum he or she desires. *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 440 (1974); *Avins v. Rutgers, supra; New Orleans v. Dukes, supra.* It would be absurd to hold that there is a fundamental right to be included in a Museum's programs under the circumstances of this case.

The conclusion must be, therefore, that there is no question of material fact and on the basis of the applicable law, the plaintiffs have failed to establish the violation of a fundamental right by the Museum's policy, and the result is that such policy will be upheld if it bears a rational relationship to a legitimate state interest.

### C. IS THE MUSUEM'S POLICY RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST?

In *Morton v. Mancari, supra,* the Indian preference was found to be " . . . reasonably and directly related to a legitimate, nonracially based goal. This is the principal characteristic that generally is absent from proscribed forms of racial discrimination." 417 U.S. at 554, 94 S.Ct. at 2484. The undisputed facts of this case meet the *Mancari* standard.

The state has several interests or goals which are being furthered by the Museum's portal policy. Foremost amongst them is the preservation and encouragement of traditional Indian arts and crafts. Equally important, however, is the survival of certain of the Pueblos as cultural and economic entities. Education by interaction with Indian people is certainly a fundamental goal of the Museum. In addition, the state has further interest of promoting tourist trade by preserving the charm and beauty of the portal area in a manner consistent with its history, and attempting to prohibit the sale of reproductions or copies of Indian goods to unsuspecting tourists.

There is not, nor can there be, any question about the legitimacy of these state interests. It is also clear that these goals are not racially based. The final question, then, is whether the policy of permitting only Indians to sell their wares under the portal is reasonably and directly related to these goals.

The existence of a rational relationship does not require the Indians to have been the only people to have sold goods under the portal during the centuries of its use as a market. It is undisputed that the portal and the Palace of the Governors have a multi-cultural history, but the Indians were an integral part of that history and are the only remaining traditional craftsmen. New Mexico is fortunate to have living purveyors of the ancient cultures of this country, and is using this "natural resource" to benefit the Indians as well as the general public.

The possibility that there are other means of accomplishing the above-mentioned legitimate state interests does not indicate the lack of a rational relationship between such state interests and the Museum policy. The policy need not be set aside if any state of facts reasonably may be conceived to justify it. It is doubtful that opening up the market to all types of vendors and craftsmen would promote the goals of the Museum as well as the present policy does. On the contrary, it is likely that the abandonment of the portal by the Indians if other craftsmen were to be permitted access would serve to accomplish the opposite of the Museum's goals of fostering traditional Indian arts and crafts, and economic well being of the Indian people.

In *Mancari, supra,* the preference was approved because it bore a rational relationship to the goal of Indian self-government and determination. The uncontroverted facts in this case show a direct link between the portal policy and the economic survival of several pueblos. Indian self-determination is meaningless if opportunities for self-support are destroyed. Therefore, it is clear that the policy is intimately and directly related to this one very legitimate, racially neutral state interest. If, as *Mancari* holds, such an interest is legitimate, and a preference for Indians is constitutional for the federal government through the BIA, then the same must be true of a state government through one of its state-owned museums. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

I therefore conclude that the Museum's policy in this case does not violate the plaintiffs' rights to equal protection under the Fourteenth Amendment; Now, Therefore,

IT IS ORDERED that the plaintiffs' motion for summary judgment is denied, and the defendants' motion for summary judgment is granted.