Robert MALABED, Plaintiff–Appellee,

v.

NORTH SLOPE BOROUGH, Defendant–Appellant.

Morris David Welch, Plaintiff–Appellee,

v.

North Slope Borough, Defendant–Appellant.

Charles Michael Emerson, Plaintiff–Appellee,

v.

North Slope Borough, Defendant–Appellant.

No. S–9808.

Supreme Court of Alaska.

May 16, 2003.

William B. Schendel, Schendel & Callahan, Fairbanks, and Kenneth L. Covell, Law Offices of Kenneth L. Covell, Fairbanks, for Plaintiffs–Appellees.

David C. Crosby, David C. Crosby, P.C., Juneau, for Defendant–Appellant.

Robert A. Royce, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Amicus Curiae Alaska State Commission for Human Rights.

David S. Case, Landye Bennett Blumstein, LLP, Anchorage, for Amicus Curiae Alaska Federation of Natives.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

The United States Court of Appeals for the Ninth Circuit certified a question to this court, asking whether a North Slope Borough ordinance enacting a hiring preference in favor of Native Americans violates state or local law. Article I, section 1, of the Alaska Constitution provides that "all persons are equal and entitled to equal rights, opportunities, and protection under the law." This provision binds local units of Alaska government, including boroughs, to govern equally and in the interest of all Alaskans. We hold that the borough lacks a legitimate governmental interest to enact a hiring preference favoring one class of citizens at the expense of others; its ordinance therefore violates the Alaska Constitution's guarantee of equal protection.

## II. FACTS AND PROCEEDINGS

In 1997 the North Slope Borough enacted an ordinance that creates a mandatory preference for hiring, promoting, transferring, and reinstating Native Americans in borough government employment. The current version of the preference extends to all Native American applicants who are minimally qualified or meet most minimum job requirements and can meet the remaining requirements during their probationary period of employment; for purposes of the preference, "Native American" is defined to include any person belonging to an Indian tribe under federal law. The ordinance provides:

The granting of employment preference to Native Americans. The preference shall apply to hirings, promotions, transfers, and reinstatements. A Native American applicant who meets the minimum qualifications for a position shall be selected, and where there is more than one Native American applicant who meets the minimum qualifications for a position, the best qualified among these shall be selected. In instances where a Native American applicant meets most of the minimum qualifications for the position and can, during the probationary period, meet the minimum qualifications, that person will be given employment preference. If, at the end of the probationary period, all the minimum qualifications have not been met, the individual may be granted a three-month extension of the probationary period, on a one time basis, by the supervisor. If the person given employment preference is not able to meet the minimum qualifications at the end of the probationary period, he or she will be dismissed from employment and the position will be re-posted. A Native American is a person belonging to an Indian tribe as defined in 25 U.S.C. Section 3703(10).[1]

The borough enacted this preference after a study of economic conditions showed that the Native American population within the borough, specifically the resident Inupiat Eskimos, was both underemployed and earning substantially less money per capita than borough residents of other races. As the area's largest local employer, the borough consulted with the federal Equal Employment Opportunity Commission to determine whether the borough might qualify for an exemption from federal equal employment opportunity laws. Specifically, the borough asked about an exemption under section 703(i) of the Civil Rights Act of 1964 (the 703(i) exception),[2] which excludes hiring preferences favoring Native Americans working on or near Indian reservations from the stric-

---

1. North Slope Borough Code (NSBC) § 2.20.150(A)(27) (1998). The original version of the hiring preference, NSB Ord. 80–26–12 (1997), did not include the extension of the preference to Native American applicants who failed to meet some of the minimum qualifications.

NSB Ordinance 80–26–13 (March 3, 1998) (amending NSBC § 2.20.150(A)(27)).

2. Section 703(i) of the Civil Rights Act of 1964 is codified as 42 U.S.C. § 2000e–2(i) (1994).

tures of Title VII of the 1964 Civil Rights Act.[3] The 703(i) exception states:

> Nothing contained in this subchapter [subchapter e of 42 U.S.C. § 2000] shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.[4]

The commission responded that, in its view, the 703(i) exception's reference to "any business or enterprise" extended to the borough, allowing it to adopt a hiring preference in favor of Native Americans without violating Title VII's equal employment opportunity provisions, assuming that the borough met the exception's other requirements. After receiving this response, the borough assembly enacted the hiring preference by an ordinance passed in February 1997; the borough implemented the preference later that year.

Robert Malabed, Morris David Welch, and Charles Emerson (collectively Malabed) individually filed suit against the borough in federal district court, asserting that they were non-Native applicants for borough employment and had been passed over for jobs in favor of lower-ranked Native American applicants. The suits claimed that the borough's Native American hiring preference violates state and federal constitutional guarantees of equal protection, the Alaska Human Rights Act, federal civil rights laws, and the borough's charter. The district court granted summary judgment to Malabed, declaring that the preference violated the borough's charter and federal equal protection. The borough appealed to the Ninth Circuit, which has certified the following question:[5]

> Is North Slope Borough Code § 2.20.150(A)(27), granting employment preferences to Native Americans in borough hiring, impermissible under local law, state statutory law, or the Alaska Constitution?

## III. DISCUSSION

### A. Overview of State Constitutional Issues

█ As already mentioned, Article I, section 1, of the Alaska Constitution guarantees equal protection, providing that "all persons are equal and entitled to equal rights, opportunities, and protection under the law." In addition, Article I, section 3, of the Alaska Constitution categorically prohibits discrimination based on race or national origin: "No person is to be denied the enjoyment of any civil or political right because of race, color, creed, sex, or national origin." The legislature implemented these provisions in part by enacting the Alaska Human Rights Act,[6] which prohibits employment discrimination based on race or national origin,[7] and AS 29.20.630, which specifically prohibits Alaska's municipalities—including home rule municipalities like the North Slope Borough—from engaging in racial and national origin discrimination.[8] In recognition of these re-

---

3. Title VII of the Civil Rights Act of 1964 is codified as subchapter e of 42 U.S.C. § 2000 (1994). Subchapter e broadly proscribes various forms of discriminatory employment practices.

4. 42 U.S.C. § 2000e–2(i) (1994).

5. Alaska Appellate Rule 407 authorizes the supreme court to answer questions of state law certified to it by certain federal courts, including courts of appeals.

6. The Alaska Human Rights Act, AS 18.80.010–18.80.300, was originally enacted in 1963. Ch. 15, SLA 1963. The legislature extended the protections of the Act to bar unlawful employment discrimination by the state or its political subdivisions in 1966. Ch. 79, § 1, SLA 1966 (enacting AS 18.80.255). AS 18.80.255 provides in relevant part: "It is unlawful for the state or any of its political subdivisions ... to refuse, withhold

from, or deny to a person any local, state, or federal funds, services, goods, facilities, advantages, or privileges because of race, religion, sex, color, or national origin[.]"

7. AS 18.80.220(a)(1).

8. AS 29.20.630 provides in relevant part:

   (a) A person may not be appointed to or removed from municipal office or in any way favored or discriminated against with respect to a municipal position or municipal employment because of the person's race, color, sex, creed, national origin or, unless otherwise contrary to law, because of the person's political opinions or affiliations.

   ....

   (c) This section applies to home rule and general law municipalities.

quirements, the borough's charter itself prohibits these forms of discrimination: "No person may be discriminated against in any borough employment because of race, age, color, political or religious affiliation, or [national] origin."[9]

Relying on these provisions, Malabed argues that the borough's hiring preference adopts a racial classification or, alternatively, a classification based on national origin, in violation of the Alaska Constitution. The borough responds by denying that its preference uses a race-conscious classification; instead, the borough insists, the preference adopts a well-accepted and constitutionally permissible political classification based on membership in federally recognized tribes. In advancing this argument, the borough relies chiefly on *Morton v. Mancari*.[10]

In *Mancari* the Supreme Court upheld a Bureau of Indian Affairs employment preference for hiring and promoting Native Americans within the BIA.[11] Several non-Native American employees challenged the preference, arguing that the 1972 Equal Employment Opportunity Act had repealed the BIA's statutory authority to grant hiring preferences to Native Americans and that the preference amounted to invidious racial discrimination in violation of their Fifth Amendment due process rights.[12] But the Court found that Congress had not repealed the BIA's authority to prefer Native Americans in hiring.[13] And after analyzing the unique historical relationship between the federal government and Native Americans, the Court concluded that the preference was not only not invidious racial discrimination but was not based on race at all.[14]

The Court pointed out that the disputed BIA preference applied only to members of federally recognized tribes and thus excluded many individuals who were racially Native American.[15] Noting the "unique legal status of Indian tribes under federal law" and the BIA's special interest in furthering Native American self-government, the Court held that the hiring preference was "reasonably and directly related to a legitimate, nonracially based goal."[16]

Assuming for present purposes that the borough's ordinance reflects this kind of political classification and does not discriminate on the basis of race, the ordinance might avoid problems with the Alaska Constitution's bar against racial discrimination. But the political nature of the classification would not necessarily insulate the ordinance from Malabed's equal protection challenge. For the borough, unlike the BIA in *Mancari*, has no obvious governmental interest, as a borough, in furthering Native American self-government; and Native Americans have no explicitly established "unique legal status" under borough law, as *Mancari* found them to have under federal law. Given these disparities between federal and local law, the legitimacy of the borough's hiring preference as a political classification is less apparent than the legitimacy of the BIA's hiring preference in *Mancari*. We must therefore consider whether the ordinance's ostensibly political lines discriminate in a way that offends the Alaska Constitution's guarantee of equal protection.

### B. Alaska's Three–Step Equal Protection Standard

We have long recognized that the Alaska Constitution's equal protection clause affords greater protection to individual rights than the United States Constitution's Fourteenth Amendment.[17] To implement Alaska's more stringent equal protection standard, we have adopted a three-step, sliding-scale test that places a progressively greater

9. NSB Charter § 16.020.

10. 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

11. *See id.* at 538, 551, 554, 94 S.Ct. 2474.

12. *See id.* at 539, 551, 94 S.Ct. 2474.

13. *See id.* at 545–51, 94 S.Ct. 2474.

14. *See id.* at 553 & n. 24, 94 S.Ct. 2474.

15. *See id.* at 553 n. 24, 94 S.Ct. 2474.

16. *Id.* at 554, 94 S.Ct. 2474.

17. *See, e.g., State, Dep'ts of Transp. & Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 631 & n. 11 (Alaska 1989).

or lesser burden on the state, depending on the importance of the individual right affected by the disputed classification and the nature of the governmental interests at stake: first, we determine the weight of the individual interest impaired by the classification; second, we examine the importance of the purposes underlying the government's action; and third, we evaluate the means employed to further those goals to determine the closeness of the means-to-end fit.[18]

### 1. Step 1: individual interests affected by the preference

■ To determine how the borough's hiring preference fares under this standard, we begin by considering the importance of the individual interests implicated by the preference. Here, the borough's hiring preference impairs Malabed's right to seek and obtain employment in his profession. Under similar circumstances, we have declared the right to employment to be an important right. In *State, Departments of Transportation & Labor v. Enserch Alaska Construction, Inc.,* we reviewed an equal protection challenge to an Alaska statute that provided hiring preferences to residents of economically distressed zones for employment on public works projects.[19] A contractor building a road for the state challenged the preference as a violation of Alaska equal protection. Addressing the first step of Alaska's three-step analysis,[20] we held that the "right to engage in an economic endeavor within a particular industry is an 'important' right for state equal protection purposes."[21]

■ Here, because the individual interest affected is almost identical to the one we considered in *Enserch*—the right to seek and obtain employment in one's profession—the interest is important for equal protection purposes; its impairment therefore requires us to give close scrutiny to the borough's hiring preference:

Close scrutiny of enactments impairing the important right to engage in economic endeavor requires that the state's interest underlying the enactment be not only legitimate, but important, and that the nexus between the enactment and the important interest it serves be close.[22]

### 2. Step 2: importance and legitimacy of borough's interests in the preference

### a. The borough's interest in the preference is not legitimate under *Enserch.*

In the second part of the equal protection analysis we consider the borough's interests, asking whether it had important and legitimate reasons to adopt the hiring preference. The borough offers several reasons supporting its ordinance: reducing unemployment of the largest group of unemployed borough residents—Inupiat Eskimos; strengthening the borough's economy; and training its workforce. But we found comparable governmental interests insufficient in *Enserch.* There the state tried to establish an important and legitimate governmental interest by arguing that the challenged hiring preference reduced unemployment, remedied social harms resulting from chronic unemployment, and assisted economically disadvantaged residents.[23] Though acknowledging these interests as important, we found them to be illegitimate because they favored one class of Alaskans over another:

> While these goals are important, they conceal the underlying objective of economically assisting one class over another. We have held that this objective is illegitimate. In *Lynden Transport, Inc. v. State,* 532 P.2d 700, 710 (Alaska 1975), we ruled that "discrimination between residents and nonresidents based solely on the object of assisting the one class over the other eco-

---

18. *Alaska Pac. Assurance Co. v. Brown,* 687 P.2d 264, 269–70 (Alaska 1984).

19. 787 P.2d at 625.

20. *See id.* at 631–32 (applying test from *Brown,* 687 P.2d at 269–70).

21. *Id.* at 632 (citing *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1266 (Alaska 1980)).

22. *Id.* at 633 (citing *Apokedak* ).

23. *See id.* at 634.

nomically cannot be upheld under ... the ... equal protection clause[ ]." While that case involved discrimination between state residents and nonresidents, the principle is equally applicable to discrimination among state residents. We conclude that the disparate treatment of unemployed workers in one region in order to confer an economic benefit on similarly-situated workers in another region is not a legitimate legislative goal.[24]

Here, as in *Enserch,* it might seem that "[t]his conclusion essentially ends our inquiry." [25] But the borough nevertheless claims a special interest in preferring to hire Native Americans (an interest not present in *Enserch* ). It theorizes that this interest flows from a specific congressional mandate—the Civil Rights Act's 703(i) exception—or from a more general duty to comply with federal policies adopted for the benefit of Native Americans. Alternatively, the borough asks us to find an implied grant of power in the Alaska Constitution giving it a trust-like interest in legislating for the benefit of Alaska Natives. But as we explain below, these alleged sources do not give the borough the legitimate interest it claims.

### b. The Alaska Constitution does not give the borough a legitimate interest in adopting the preference.

■ We reject at the outset the notion that the Alaska Constitution radiates implied guardianship powers allowing the state or its boroughs to treat Alaska Natives as if they were wards. To be sure, the United States Supreme Court has recognized implied powers in the United States Constitution that allow Congress broad latitude to legislate on behalf of Native Americans.[26] The borough reasons that the Alaska Constitution must implicitly grant parallel powers to state and municipal governments. But the federal government's implied powers spring directly from the express powers granted to Congress in the United States Constitution's Indian Commerce and Treaty clauses:

The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article I, § 8, cl. 3, provides Congress with the power to "regulate Commerce ... with the Indian Tribes," and thus, to this extent, singles Indians out as a proper subject for separate legislation. Article II, § 2, cl. 2, gives the President the power, by and with the advice and consent of the Senate, to make treaties. This has often been the source of the Government's power to deal with the Indian tribes.[27]

In contrast to the federal constitution's provisions dealing with Indian tribes, the Alaska Constitution includes no provisions authorizing state action regarding Alaska Natives and so grants no express powers from which implied powers could arise. Indeed, the only provision of the Alaska Constitution that addresses the state's relations with Alaska Natives is article XII, section 12, which effectively disavows any state authority comparable to the federal government's protective powers. Thus, article XII, section 12, expressly disclaims all "right or title in or to any property, including fishing rights, the right or title to which may be held by or for any Indian, Eskimo, or Aleut, or community thereof," and further specifies "that, unless otherwise provided by Congress, the property, as described in this section, shall remain subject to the absolute disposition of the United States." [28] To the extent that the Alaska Constitution implies anything concerning the state's relations with Alaska Natives, then, it mirrors the constitutional drafters' well-recognized desire to treat Alaska Natives like all other Alaska citizens.[29] The

24. *Id.* (alterations in original) (footnote omitted).

25. *Id.*

26. *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

27. *Id.*

28. Alaska Const. art. XII, § 12.

29. *See* 4 Proceedings of Alaska Constitutional Convention 2525, 2527–91 (Jan. 18, 1956). As Delegate Davis said:

[W]e consider the Eskimo and the Indian a citizen just the same as all the rest of us. We don't consider that he is any better than we are, and we don't consider that he is any worse. He is a man just like we are; and he is entitled to all the rights and privileges and

Alaska Constitution thus implies nothing that would give the borough a legitimate interest in enacting the disputed preference.

### c. The 703(i) exception does not give the borough a legitimate interest in adopting the preference.

The borough next contends that the Civil Rights Act's 703(i) exception gives it a legitimate interest in enacting the challenged preference. We agree in theory that Congress can create specific mandates or interests empowering states or units of local government to legislate on behalf of Native Americans without creating suspect classifications. Yet such mandates or interests have been found to arise in two relatively narrow situations: in the first, the state acts under a particularized, state-specific congressional delegation of jurisdiction;[30] in the second, the state acts to accommodate federal supremacy in the field by enforcing congressionally created federal obligations toward Indian tribes that the federal government would otherwise enforce on its own.[31] The borough's reliance on the Civil Rights Act's 703(i) exception presents little in common with these situations.

Preliminarily, we note that the disputed ordinance itself raises serious questions concerning its compliance with the federal exception's purpose. The Equal Employment Opportunity Commission interprets the 703(i) exception to sanction preferences only to Native Americans generally, not to Native Americans of a particular tribe.[32] The body of the borough's ordinance nominally conforms to the 703(i) exception, extending the hiring preference to all "Native Americans," a term that the ordinance defines to include all persons belonging to Indian tribes as defined under federal law.[33] But the ordi-

---

all the duties of citizenship, just as we are; and he is covered by the bill of rights that we are adopting here, just as we are.

*Id.* at 2536–37. *See also Atkinson v. Haldane,* 569 P.2d 151, 155 (Alaska 1977) (approvingly quoting Justice Frankfurter's opinion in *Metlakatla Indian Cmty. v. Egan,* 369 U.S. 45, 50–51, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962)).

**30.** *See, e.g., Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (a state law relating to Native Americans does not create a "suspect" class for purposes of equal protection when enacted in direct response to congressional authorization specifically aimed at the state).

**31.** *See, e.g., Puget Sound Gillnetters Ass'n v. Moos,* 92 Wash.2d 939, 603 P.2d 819, 824 (1979) (holding that the special status of Native Americans under federal law created a "permissible class" for purposes of state equal protection allowing Washington to protect treaty-guaranteed Native American access to fisheries in Washington after Supreme Court indicated in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 695–96, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), that Supremacy Clause would grant federal courts power to enforce those rights directly).

**32.** See Policy Statement on Indian Preference Under Title VII, N–915.027, 8 Lab. Rel. Rep. (BNA) (Fair Emp. Prac. Manual) 405:6647 (May 16, 1988). This interpretation accords with *Mancari*'s view of the exception as a provision enacted in recognition "of the unique legal status of tribal and reservation-based activities." *Morton v. Mancari,* 417 U.S. 535, 545–46, 94 S.Ct.

2474, 41 L.Ed.2d 290 (1974) (discussing 703(i) exception); *see also Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,* 154 F.3d 1117, 1118, 1124 (9th Cir.1998) (holding that hiring preference for Navajos discriminates against Hopis and other Native Americans on basis of national origin).

**33.** *See* NSBC § 2.20.150(A)(27) (1998) ("A Native American is a person belonging to an Indian tribe as defined in 25 U.S.C. Section 3703(10)."). We note that in 1988 the EEOC issued a formal interpretation and policy statement regarding the 703(i) exception. The statement "delineate[d] [the EEOC's] position with respect to the exception provided in Section 703(i) of the [1964 Civil Rights] Act." *See* Policy Statement on Indian Preference Under Title VII, N–915.027, 8 Lab. Rel. Rep. (BNA) (Fair Emp. Prac. Manual) 405:6647 (May 16, 1988). The statement took the position that "the terms 'Indian reservation' and 'reservation' in Section 703(i) of Title VII include ... land held by incorporated Native groups, regional corporations, and village corporations in Alaska under the provisions of the Alaska Native Claims Settlement Act." *Id.* at 6650. In 1996, relying in part on the 1988 policy statement, an EEOC attorney sent the borough an opinion letter expressing the view that "Title VII permits a state or local government employer to invoke the Indian preference provision in section 703(i)"; yet the letter also noted that the borough would have to meet the exception's other criteria, "including the 'on or near a reservation' requirements." For purposes of deciding this case, we assume arguendo that the borough meets the "on or near an Indian reservation" requirements under the 703(i) exception, expressing no opinion on that issue.

nance's prefatory, *"Whereas,"* clauses repeatedly and unequivocally declare that its actual purpose is to benefit the North Slope Borough's "Inupiat Eskimos," who comprise the majority of the borough's citizens.

Unlike the term "Native American," "Inupiat Eskimo" does not appear to be defined anywhere as requiring tribal membership or any other arguably *political* status; indeed, it does not appear to describe any particular Indian tribe. And because the class defined by the statement of purposes extends only to Inupiat Eskimos residing in the North Slope Borough, the class that the ordinance intends to prefer is far narrower than the one defined in the 703(i) exception—members of all federally recognized Indian tribes. Because the ordinance expressly professes an intent to benefit a class defined by borough residency and race, its nominally political preference in favor of all Native Americans could be construed as a proxy for an illegitimate race-conscious purpose.[34]

However, we need not decide the case on this basis.[35] For even assuming that the ordinance was properly enacted for its nominal purpose and thus satisfies the 703(i) exception's letter and spirit, we conclude that the borough fails to pinpoint any legitimate governmental interest in enacting a hiring preference in reliance on that exception. The borough's position that the 703(i) exception *is* its legitimate interest strains too hard to extract an affirmative mandate from a law that simply creates an exception.

Title VII of the Civil Rights Act of 1964 bars discrimination in employment practices, including racially discriminatory hiring practices.[36] The 703(i) exception appears in a section entitled "unlawful employment practices."[37] The exception's primary effect is to exclude employers located on or near a reservation from various equal employment requirements of the Civil Rights Act that govern "otherwise-unlawful preferential treatment given to Native Americans in certain employment[.]"[38] The exception does not create a hiring program; it does not mandate that any preferences be granted; it does not require any particular action or specify negative consequences for any inaction; and it does not purport to endorse—nor does it imply endorsement of—any particular preference by any particular employer in any particular location. Hence, although the 703(i) exception undoubtedly reflects Congress's strong desire to encourage preferences under the exception's specified circumstances, its mechanism is fundamentally passive: instead of actively creating employer interests, it presupposes that those interests already exist or will be offered elsewhere.[39]

**34.** *Cf. Rice v. Cayetano*, 528 U.S. 495, 514, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (warning that "[a]ncestry can be a proxy for race"); *Dawavendewa*, 154 F.3d at 1120 (hiring preference favoring specific tribe discriminates on basis of national origin). We are aware that the EEOC has recognized that "as a practical matter," 703(i) preferences "may operate, in effect, to favor only members of [a] specific tribe without disadvantaging Indians of other tribes;" in the EEOC's view, these circumstances do not impair the preference's validity. *See* Policy Statement on Indian Preference Under Title VII, N–915.027, 8 Lab. Rel. Rep. (BNA) (Fair Emp. Prac. Manual) 405:6654 (May 16, 1988). But while the EEOC's position tolerates these unavoidable incidental *effects*, it stops well short of condoning a preference enacted for the express *purpose* of favoring a narrow class of local residents defined by their racial or cultural heritage.

**35.** In briefing this case, neither party specifically discusses the significance of the disparity between the body of the ordinance and its statement of purposes or whether the ordinance's stated purposes jeopardize its compliance with the 703(i) exception. Moreover, the issue is complicated by the discussion of the exception set out in the EEOC's 1988 policy statement, which lends itself to varying interpretations and could generate misunderstanding. *See* note 33, above. Given these circumstances, we choose not to rest our decision on the ordinance's apparently race-conscious statement of purposes.

**36.** 42 U.S.C. § 2000e–2(a) (1994).

**37.** 42 U.S.C. § 2000e–2(i) (1994), *quoted at* note 4, above.

**38.** 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 387 (Paul W. Cane, Jr., ed., 3d ed.1996).

**39.** Given our conclusion that the 703(i) exception creates no general state or borough interests in enacting hiring preferences, we find no merit to the borough's contention that the exception preempts any state law prohibiting a borough

Though similar to the present case in certain respects, the Tenth Circuit's decision in *Livingston v. Ewing* does not support the proposition that the 703(i) exception creates a broad enough interest to allow state and local government action.[40] There, the Tenth Circuit allowed the City of Sante Fe to restrict vendors of handcrafted jewelry within the grounds of the Museum of New Mexico and the Palace of the Governors to members of Native American tribes,[41] declaring that the 703(i) exception was sufficiently broad to sustain the preference.[42] In so doing, the court read *Morton v. Mancari* as holding that an employment preference is "not to be considered racial discrimination of the type generally proscribed" when it turns on "the unique legal status of Indians under federal law ... and the assumption of guardian-ward status to legislate specially on behalf of Indian tribes."[43] Applying this interpretation, the court found *Mancari* to be a "very strong precedent for upholding the grant of the exclusive right to the Indians in the present case based on the employment statute in § 2000e–2(i) [the 703(i) exception]."[44]

The Tenth Circuit's ruling is distinguishable from this case for important reasons. The plaintiffs in *Livingston* did not challenge the city's actions under state constitutional law—they based their challenge strictly on the Fourteenth Amendment to the federal constitution.[45] Unsurprisingly, then, the claim in *Livingston* gave the Tenth Circuit no reason to look beyond the "unique legal status of Indians under *federal* law"[46]—a status that exists and creates strong federal interests independently of the 703(i) exception. Moreover, the state interest furthered by the preference in *Livingston* was a strong and specific interest in preserving New Mexico's historical and cultural traditions: the preference only extended to established Indian uses of Santa Fe's historic Palace of Governors, reportedly the oldest public building in the United States; Indian use of the site dated back to the 1680s, and the particular activities covered by the preference had been performed almost exclusively by Indians since the early 1900s.[47] The court viewed these facts as establishing a compelling state interest in "acquiring, preserving and exhibiting historical, archeological and ethnological interests in fine arts."[48] *Livingston* thus stands in sharp contrast to the borough's case. Nothing in the Tenth Circuit's ruling in *Livingston* indicates that the court viewed the 703(i) exception alone as creating affirmative interests sufficient to sustain a municipal hiring preference in favor of Native Americans. And unlike the City of Santa Fe in *Livingston*, the borough here advances no independently viable state interest in economically preferring one group of workers over others; the economic interests it asserts are indistinguishable from those that we

from enacting a preference. For a similar reason, we reject the borough's related contention that its interest in enacting a Native hiring preference flows from a general duty implied under federal law to "implement federal Indian policy." The borough cites *Morton v. Mancari* as confirming this interest. But by tying the federal government's "unique obligation toward the Indians" to the powers that arise under the United States Constitution's Indian Commerce and Treaty clauses, which are plenary and extend exclusively to Congress, 417 U.S. at 551–52, 94 S.Ct. 2474, *Mancari* cements the point that federal law implies no general role for states to play in carrying out federal Indian policy, leaving it to Congress to enlist state aid or direct state action by positive law. Our conclusion that no legitimate borough interest in a preference arises under the 703(i) exception—the only positive federal law that the borough contends is applicable—thus disposes of the point.

40.   601 F.2d 1110 (10th Cir.1979).

41.   *Id.* at 1111, 1115. The Museum and Palace were not on a reservation and were state properties. *See id.* But see *Tafoya v. City of Albuquerque,* 751 F.Supp. 1527, 1530–31 (D.N.M.1990) (declaring unconstitutional under a strict scrutiny analysis a similar city ordinance in Albuquerque limiting vending within Old Town to Indians).

42.   *Livingston,* 601 F.2d at 1114–15.

43.   *Id.* at 1113.

44.   *Id.* at 1114.

45.   *See id.* at 1112.

46.   *Id.* at 1113 (emphasis added).

47.   *Id.* at 1112; *Livingston v. Ewing,* 455 F.Supp. 825, 827–28 (D.N.M.1978).

48.   *Livingston,* 601 F.2d at 1115.

found illegitimate in *Enserch*.[49]

We by no means suggest that boroughs are categorically barred from adopting hiring preferences.[50] Nor do we suggest that all state or local legislation pertaining to Alaska Natives or tribal governments should be assumed to establish suspect classifications presumptively barred by equal protection.[51] Our focus is considerably narrower: we simply hold, in keeping with *Enserch*, that the borough has no legitimate basis to claim a general governmental interest in enacting hiring preferences favoring one class of citizens over others;[52] and we find that the borough has failed to identify any source of a legitimate, case-specific governmental interest in the preference it actually adopted—a hiring preference favoring Native Americans.[53] Because the borough is a political

**49.** *Krueth v. Indep. Sch. Dist. Number 38*, 496 N.W.2d 829 (Minn.App.1993), is inapposite for similar reasons. The case did not address a preference arising under the 703(i) exception and cannot fairly be read as supporting the proposition that this exception creates state interests justifying Indian employment preferences. *Krueth* considered a provision of Minnesota's American Indian Education Act allowing schools with ten or more American Indian students to retain American Indian teachers with less seniority over non-Indian teachers with more seniority. *Id.* at 833. The Minnesota legislature enacted the provision to meet "the unique educational and culturally-related academic needs of American Indian people." *Id.* (quoting Minn.Stat. § 126.46 (1990)). As in *Livingston*, the equal protection challenge in *Krueth* was advanced only under the federal constitution. *Id.* at 835. Characterizing the challenged preference as a political classification of the kind recognized in *Mancari*, the court in *Krueth* decided to apply rational basis review in determining its constitutionality. *Id.* at 836, 837. Under this standard, the court upheld the statute as applied to the school district action at issue; noting that "[t]his school district is located entirely on the Red Lake Reservation and consists of a student population almost 100% American Indian," the court observed that if the challenged statute "has meaning anywhere in the State of Minnesota, it has meaning in Independent School District No. 38, Red Lake, Minnesota." *Id.* at 837. *Cf. Tafoya v. City of Albuquerque*, 751 F.Supp. 1527, 1530–31 (D.N.M.1990) (striking down ordinance after finding that city did not have powers similar to the federal government that would enable city to prefer members of federally recognized tribes).

**50.** *Cf. Laborers Local 942 v. Lampkin*, 956 P.2d 422, 431–32 (Alaska 1998) (upholding Fairbanks North Star Borough's requirement that successful construction contract bidder enter into project labor agreement with local labor unions given established use of such agreements in construction industry, Congress's endorsement of the agreements, and close nexus between agreement and borough's important economic interests); *see also Krueth*, 496 N.W.2d at 836.

**51.** To the contrary, we think that the state has considerable latitude in dealing with recognized tribes as to matters of intersecting governmental concern when the state's actions rationally promote legitimate mutual governmental or proprietary interests. Illustrations of political classifications that meet these criteria are not confined to any particular branch of state government. For example, AS 47.14.100(g) allows the Department of Health and Social Services to "enter into agreements with Alaska Native villages or Native organizations under 25 U.S.C. § 1919 (Indian Child Welfare Act of 1978) respecting the care and custody of Native children and jurisdiction of Native child custody proceedings." This legislative provision relates to inter-governmental interaction and is designed to further Native self-governance by involving Native governments in custody determinations of their own members. In the executive branch, Administrative Order 186 exemplifies a political classification, acknowledging "the legal and political existence of the federally recognized Tribes within the boundaries of Alaska" and declaring the state's commitment "to work on a government-to-government basis with Alaska's sovereign Tribes, which deserve the recognition and respect accorded to other governments[,]" and to "establish[ ] a comprehensive and mutually respectful State Tribal relations policy in an effort to promote and enhance Tribal self-government, economic development, a clean and healthy environment, and social, cultural, spiritual, and racial diversity." Administrative Order No. 186 (Sept. 29, 2000) (superceding and revoking Administrative Order No. 125 (Aug. 16, 1991)). And in the judicial arena, this court relied on a political classification in applying principles of comity to acknowledge that federally recognized tribes in Alaska retain concurrent jurisdiction to adjudicate disputes between tribal members and that their judgments should be accorded comity in appropriate cases. *John v. Baker*, 982 P.2d 738, 749–50, 762–63 (Alaska 1999).

**52.** *See State, Dep'ts of Transp. & Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 634 (Alaska 1989); *see also Lynden Transport, Inc. v. State*, 532 P.2d 700, 708–10 (Alaska 1975).

**53.** We emphasize that the borough has not attempted to defend its ordinance as an affirmative action measure necessary to remedy a historical imbalance attributable to discriminatory hiring. Since the issue is not presented here, we need not determine the circumstances under which a borough might make a viable showing of affirmative action. Based on the current briefing and the limited record on certification, however, it

subdivision of Alaska, its legitimate sphere of municipal interest lies in governing for all of its people; preferring the economic interests of one class of its citizens at the expense of others is not a legitimate municipal interest, regardless of whether we view its ordinance as drawing distinctions founded on political status or race.

### 3. Step 3: means-to-end fit

The last step of equal protection analysis under the Alaska Constitution examines the nexus between the state's asserted interests and the means selected to implement those interests. As previously mentioned, even when the state acts for important and legitimate reasons, its action must bear a close connection to those interests to justify impairing an important individual right.[54] Here, of course, because we have found no legitimate borough interest supporting the challenged preference, we need not dwell on the closeness of its means-to-end fit. But a brief comment on the issue is nevertheless important to establish an alternative basis for our equal protection ruling.

For even assuming that the borough had legitimate and important interests in enacting a hiring preference favoring Native Americans, its preference is not closely related to attaining those interests. Addressing a similar situation in *Enserch*, we found a hiring preference in favor of residents of eco-

nomically distressed areas unconstitutional under Alaska's equal protection guarantee in part because the fit between the preference and its objective was not sufficiently close.[55] We noted that the preference failed to "prioritize relief for those areas most affected by nonresident employment"[56] and that it set no meaningful limits on the state's power to declare any part of Alaska economically distressed at any time.[57]

Here, the nexus between the borough's preference and its stated goals is insufficiently close for comparable reasons. The primary interest asserted by the borough lies in reducing Native American unemployment.[58] But when viewed in light of this purpose, the borough's hiring preference is stunningly broad: it extends borough-wide and to all aspects of borough employment; is potentially limitless in duration; covers not only hiring but also promotions, transfers, and reinstatements; and applies absolutely—even to the extent of requiring Native American applicants without minimum qualifications to be hired over qualified non-Native applicants. Because the borough advances no particular reasons to justify these sweeping provisions, it fails to establish a close fit between its goals and its actions.

### IV. CONCLUSION

We conclude that the borough's hiring preference violates the Alaska Constitution's

---

seems unlikely that the borough could have prevailed on an affirmative action claim under prevailing federal constitutional standards. *See, e.g., Messer v. Meno*, 130 F.3d 130, 133, 136 (5th Cir.1997) (describing diversity-focused "affirmative action plans" and emphasizing that governmental racial preferences are constitutionally permissible only when necessary to counteract past provable discrimination by the governmental unit involved) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (government contractor preference using race to identify social and economic disadvantage was subject to strict scrutiny); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (government contractor preference using race to identify social and economic disadvantage was subject to strict scrutiny); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 477–78, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (describing system of city contracting, held unconstitutional, that required

general contractors to award 30% of contract's value to minority business subcontractors); *Williams v. Babbitt*, 115 F.3d 657, 666 (9th Cir. 1997) (circumstances may no longer support remedial justification for Bureau of Indian Affairs policy precluding non-Natives from owning reindeer in Alaska); *cf. Russell v. Municipality of Anchorage*, 743 P.2d 372, 372–73 (Alaska 1987) (describing affirmative action program that passed over plaintiff's application to police academy as "minority bump," but declining to review program, because claim was barred by statute of limitations).

**54.** *See Enserch*, 787 P.2d at 633.

**55.** *See id.* at 634–35.

**56.** *See id.*

**57.** *See id.*

**58.** *See* NSBC § 2.20.150(A)(27) (1998); NSB Ord. 80–26–13 (March 3, 1998).

guarantee of equal protection because the borough lacks a legitimate governmental interest to enact a hiring preference favoring one class of citizens at the expense of others and because the preference it enacted is not closely tailored to meet its goals.

MATTHEWS, Justice, concurring.

MATTHEWS, Justice, concurring.

I agree with the opinion of the court that the borough hiring preference violates the equal rights clause of the Alaska Constitution and with much of the court's reasoning. But I prefer to address directly the question whether the ordinance discriminates on the basis of race.[1] I believe that it does, for the reasons that follow.

Inupiat Eskimos are a racial rather than a tribal group.[2] The ordinance frankly acknowledges that its goal is to benefit them. In a prefatory clause the ordinance states "that its purpose in establishing an employment preference for Native Americans is to employ and train its Inupiat Eskimo residents in permanent, full-time positions...." Another clause sounds the same theme: "Whereas, to increase the employment of Inupiat Eskimos, the North Slope Borough would like to give an employment preference to Native Americans...." Similarly, the implementation plan for the ordinance expressly states that its purpose is to employ Inupiat Eskimo residents. Further, at oral argu-

ment counsel for the borough explained that one reason the term "Native American" was defined in terms of tribal membership was that it served to distinguish eligible Native Americans from others who are not eligible for benefits under the preference ordinance even though they may have some Native American ancestors. Tribal membership was thus used as a convenient mechanism to describe bona fide Native Americans.

Based on the above we can say with confidence that the purpose of the ordinance was to discriminate on the basis of race. Because by the express terms of the civil rights clause of the Alaska Constitution race is a suspect category, the ordinance must be subjected to strict scrutiny in order to determine whether it is permissible under the equal rights and civil rights clauses.[3] But even if there were no clear indicators of an intent to discriminate on the basis of race, I believe that strict scrutiny would still be required because tribal membership is not only a political category but a racial one.[4]

I reach the conclusion that state or municipal laws that grant individual benefits differentially based on tribal membership should be subject to strict scrutiny for a number of reasons. As noted, this is how we treat all race-based classifications. Further, strict scrutiny is well designed to ensure that laws remain race-neutral, as contemplated by the

---

1. To put a human face on what might otherwise appear to be merely an abstract discussion of legal theory, I include the following from Judge Sedwick's opinion in this case:

   Malabed is an [Asian–American] of Filipino descent; he is not a Native American. Malabed worked for NSB as a temporary security guard from 1994 through 1998. He applied for a permanent security guard position in July 1997. North Slope Transit [an arm of the North Slope Borough] hired Malabed as a permanent security guard in August 1997, but immediately thereafter canceled the appointment. North Slope Transit re-noticed the position and solicited new job applications. The re-notice announced that NSB's employment preference for Native Americans previously described would apply for the position Malabed sought. Malabed was not hired. North Slope Transit terminated Malabed's temporary assignment on January 14, 1998, because NSB law prohibits temporary employees from holding a position longer than 120 days.

*Malabed v. North Slope Borough,* 42 F.Supp.2d 927, 929 (D.Alaska 1999).

2. *See* Op. at 424.

3. Alaska Const. art. I, §§ 1, 3. We have consistently indicated that racial classifications are subject to strict scrutiny review. *Gonzales v. Safeway Stores, Inc.,* 882 P.2d 389, 396 n. 7 (Alaska 1994); *State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio,* 858 P.2d 621, 626 (Alaska 1993); *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1261 (Alaska 1980). Using strict scrutiny, "differential treatment will be upheld only when the purpose of the enactment furthers a 'compelling state interest' and the enactment itself is 'necessary' to the achievement of that interest." *State v. Ostrosky,* 667 P.2d 1184, 1192 (Alaska 1983).

4. *See, e.g., Arctic Slope Native Ass'n v. Paul,* 609 P.2d 32, 37 (Alaska 1980) (describing "Tribe" as "a racially discrete population group").

framers of the Alaska Constitution.[5] This case illustrates that tribal membership readily lends itself to use as a proxy for a racial classification and as a pretext for racial discrimination. An effective tool is necessary to prevent these abuses.[6] In addition, strict scrutiny is the approach taken by some federal courts in tribal classification cases when construing the equal protection clause of the Fourteenth Amendment to the federal constitution.[7] Since the federal constitution contains provisions authorizing legislation on behalf of Native Americans, while the Alaska Constitution presumptively prohibits such legislation,[8] it follows that stronger reasons exist for using the strict scrutiny method for state constitutional questions than for those arising under the federal constitution.

Although strict scrutiny review presents a high barrier, it is a barrier that may be overcome in deserving cases. It is impossible to categorize the kinds of cases that might pass strict scrutiny review. But a federal law calling on the state to give preferential treatment to tribal members[9] would almost certainly present a compelling justification for state legislation. On balance, I believe that strict scrutiny properly accommodates the state's strong interest in preventing discrimination on the basis of race and its relatively rare and limited need to act adjunctively with the federal government in programs that favor tribal members over other state citizens.

The present ordinance does not survive strict scrutiny review. As the opinion of the court establishes, the borough had no legitimate interest, much less a compelling one, in adopting the preference.[10] I believe there-

fore that the ordinance is prohibited by article I, sections 1 and 3 of the Alaska Constitution.

---

**5.** *See* Op. at n. 29 & accompanying text.

**6.** The reasons for applying strict scrutiny are especially strong when preferential benefits are granted on the basis of a racial classification that benefits a majority of the constituents of the enacting entity. As Judge Sedwick stated: "Courts should be particularly alert when a majority arrogates to itself special privileges and rights otherwise denied to similarly situated members of the minority." *Malabed,* 42 F.Supp.2d at 940.

**7.** *See Malabed,* 42 F.Supp.2d at 937–40; *Tafoya v. City of Albuquerque,* 751 F.Supp. 1527, 1530–31 (D.N.M.1990).

**8.** *See* Op. at 422–423.

**9.** The Indian Child Welfare Act, 25 U.S.C. § 1901–1923, 1951, is an example. In response to this act the Alaska Child in Need of Aid Rules contain numerous provisions requiring differential treatment of Native Americans. *See, e.g.,* Alaska CINA Rules 17(c) and (d)(2), 18(c)(2)(B), and (3).

